(164 App. Div. 296)

## PEOPLE v. MYER.

(Supreme Court, Appellate Division, Fourth Department. November 11, 1914.)

1. INDICTMENT AND INFORMATION (§ 128*)—DEGREES OF OFFENSE—JOINDER.

Under Code Crim. Proc. § 279, providing that the crime may be charged in separate counts to have been committed in a different manner or by different means, and where the acts complained of may constitute different crimes, such crimes may be charged in separate counts, an indictment in five counts, three of which charged arson in the first degree and two arson in the second degree, all based on the same occurrence, was not demurrable as charging more than one crime.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 403–413; Dec. Dig. § 128.*]

2. ARSON (§ 37*)—VERDICT—WEIGHT OF EVIDENCE.

In a prosecution for arson, circumstantial evidence *held* insufficient to sustain a conviction of arson in the second degree.

[Ed. Note.—For other cases, see Arson, Cent. Dig. §§ 71–73; Dec. Dig. § 37.*]

3. CRIMINAL LAW (§ 568*)—ELEMENTS OF OFFENSE—MOTIVE.

While it is unnecessary to show motive, if accused actually committed the crime, yet where the case depends entirely on circumstantial evidence which of itself is not very satisfactory, the absence of motive is a strong circumstance in exculpation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1271; Dec. Dig. § 568.*]

4. CRIMINAL LAW (§ 730*)—APPEAL—PREJUDICE—MISCONDUCT OF COUNSEL.

Where, in a criminal prosecution, assistant counsel for the people made improper statements during the taking of testimony and in argument, bringing to the jury's attention the fact that defendant had not testified, and charging the suppression of evidence, with a deliberate purpose of getting before the jury matters not in evidence, and improperly influencing them to convict, and the court on objection merely directed that an exception be noted, the conviction would be set aside.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1693; Dec. Dig. § 730.*]

Robson and Foote, JJ., dissenting.

Appeal from Trial Term, Seneca County.

John Myer was convicted of arson in the second degree, and he appeals from such conviction, from the order disallowing the amended demurrer to the indictment, and from the order denying his motion for a new trial and in arrest of judgment. Reversed, and a new trial ordered.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

N. D. Lapham, of Geneva, for appellant.

Leon S. Church, Dist. Atty., of Interlaken, and Louis E. Fuller, of Rochester, for the People.

KRUSE, P. J. The defendant was convicted of the crime of arson in the second degree, upon an indictment accusing him of setting on fire a certain building, in the town of Lodi, Seneca county. A part of the building was occupied as a clothing store, known as the "Freuden-

heim Store," and another part as a public library. The fire was communicated from this building to other buildings, including certain dwelling houses.

There are five counts in the indictment, three of which charge arson in the first degree and two, arson in the second degree. A demurrer to the indictment was interposed, setting forth various grounds, among others that more than one crime was charged. The demurrer was disallowed. The same questions were again raised upon the trial in various forms, and after the trial upon a motion in arrest of judgment and for a new trial, but decided against the defendant.

[1] We are of the opinion that the indictment is sufficient, that the separate counts were proper under the provisions of section 279 of the Code of Criminal Procedure, and that the questions relating to the indictment were properly decided against the defendant.

[2] But the other points urged for reversal are more serious. The evidence upon which the defendant was convicted is wholly circumstantial. Unless the testimony of the witness, Charles Galloup, is to be believed that he saw the defendant running away from the fire about the time it started, as he describes, the judgment of conviction cannot be sustained; and his evidence was so unsatisfactory and improbable in some of its aspects as to leave the learned justice who presided at the trial in grave doubt as to whether the conviction should stand, although he denied the motion for a new trial.

Main street divides the little hamlet of Lodi, where the fire occurred. Galloup conducted a barber shop and poolroom in a building diagonally across the street from the Freudenheim store, where the fire started. Galloup's barber shop is on the west side and the Freudenheim store was on the east side of the street. The fire started about 2 o'clock in the morning of December 5, 1913. The wind was blowing strong from the northwest, so that several dwellings southeast from the Freudenheim store were destroyed and many others endangered, including defendant's dwelling, which was seven or eight buildings southerly of the Freudenheim store on the same side of the street, a distance therefrom of between 400 and 500 feet.

Galloup testified, in substance, that he and one Harris were sitting in his barber shop, talking; that he heard a noise like breaking glass, and concluded that a burglary was being committed. He went upstairs and came back with an automatic repeating shotgun. As he came downstairs he asked Harris to turn off the lights and then went over to a drawer, took out a revolver and handed it to Harris. It was then about midnight. They sat or walked about the shop in the darkness, talking low, watching for burglars, about an hour, when Harris went away to tell his mother that he would not be home till later. Harris returned in about ten minutes with a revolver of his own. The two men then watched for about an hour longer, when Galloup discovered what he describes as a moving lighted match in the Freudenheim store, and immediately thereafter the fire broke out, coming through a window on the south side of the building next to the alley. He called Harris' attention to it, saying "They have fired the Jew's," and ran out of the shop, Harris behind him, and fired his

gun three times at a man who ran out of the alley and along and
across the street, diagonally and in a southwesterly direction toward
the Eagle Hotel, which is on the same side of the street as Galloup's
shop and about a hundred feet southerly therefrom. Galloup states
that he recognized the man at whom he shot, as the defendant; that
the man stood for an instant looking at him after coming out of the
alley, and that he (Galloup) looked at the man. He says it was dark,
but that it was light enough for him to see, and he recognized the man
as he was standing there, going so far in his testimony as to say
that he saw the light reflected in one of the man's eyes. The man
started to run, and he shot, but the man continued running, and he
shot again, and then shot a third time. Galloup states that he in-
tended to hit the running man, and although he was a wing shot, as
he admits, failed to hit him if the defendant was the man, as the man
continued running and a subsequent examination of the defendant's
body disclosed no evidence of his having been hit. Harris testified
that he saw no one, but he swears he heard some one running. Gal-
loup admits he did not tell his companion who the man was he shot
at, although he then knew who he was. After some questioning by
counsel upon this point, the trial judge finally asked Galloup these
questions:

"Q. Did you say to Harris, who was right there with you, 'Why it is Myer,'
or anything of that kind? A. No, sir. Q. Or he didn't say anything to you
on that subject at that time? A. No, sir. Q. You recognized him, and simply
he passed into the darkness, and you made no comment to your companion as
to who he was, is that it? A. I think I asked him who it was, and he said
he didn't know, he didn't see him. Q. And did you tell him the impression
that was left with you as to who it was? A. No, sir; I did not."

And Galloup further admitted that he never told any one who the
man was until several weeks afterward. His explanation for this
delay is that he was told not to reveal the identity of the man at whom
he shot. But that suggestion, if made to him at all, was not made
until later, and does not seem to furnish a very satisfactory explana-
tion why he should ask Harris who the man was, or should not dis-
close to Harris his identity, if he actually knew at that time who he
was.

On Monday, following the Friday of the fire, a Mr. Campbell, who
seems to have been a member of a Vigilance Committee organized to
investigate the fire, went with Galloup to Buffalo to the Pinkerton
Detective Agency to have the fire investigated. Galloup was there
interviewed by the manager of the agency, and the latter testified that
Galloup told him it was Ollie Williams whom he had seen running
away from the fire and shot at. Galloup would not swear positively
that he did not so state. The best he could do was to say that he had
no recollection of so stating to the manager, but admitted that he told
him that Ollie Williams and Anthony Monaghan "were guilty; knew
something about it"; and he further admitted that he did not, at
that time or later, tell the manager that he identified the defendant as
the man who ran away from the fire, although he remained in Buffalo
several weeks and was at the office of the detective agency very fre-
quently. Not even Campbell was told the name of the man Galloup

shot at, although Campbell testifies that he told Galloup not to disclose at that time the name of the person he shot at. But Galloup himself swears that Campbell never made any such suggestion to him. However, it was not until his return to Lodi from Buffalo, and after the Vigilance Committee had secured the services of the Burns Detective Agency, that Galloup told any one that it was the defendant whom he saw running from the fire, and then only in response to a suggestion or inquiry of a detective from that agency, as to whether it was not the defendant whom he saw, to which he replied that it was.

Several witnesses testified that while the fire was in progress they asked Galloup who it was he shot at, and he said it was so dark he could not tell. Other witnesses, who claim to have heard the same inquiry, state that Galloup made no response thereto, and one or two witnesses say that they suggested that night that he better not reveal the identity of the man shot at, in view of the excited condition of the people at that time. Campbell testified, as has been stated, that he told Galloup when they went to the detective agency that he better not disclose the name of the man, but he does not claim that Galloup told him who it was. If Galloup did in fact know at the time of the shooting, that the defendant was the man shot at, his conduct in not revealing that fact to any one sooner than he did seems at least strange and unnatural.

It is true that there is testimony that shortly after the fire started the defendant was seen in the locality toward which Galloup claims he saw the defendant running; but, even so, that is not necessarily inconsistent with the defendant's innocence. Both the defendant's wife and his daughter testify that they were awakened by the shots, got up, and that the defendant was then in bed; that the shots were spoken of, and the defendant got up. They all dressed and were afterward seen on the street. The persons who claim to have seen the defendant in the locality toward which the man was seen to run were themselves aroused by the shots or alarm of fire, and must have had time to dress and go out upon the street, where they claim to have seen the person whom they identified as the defendant. There is evidence that after the fire had started, the defendant was seen at the hotel with a pail, for the purpose, as it is claimed, of helping to put out the fire, but that he was advised to look after his own house, which was endangered, and that he then went back home to watch his own house, put a ladder against the house and told his wife and daughter to pack up, and some of the things were packed and removed from the house.

The only possible motive suggested by the prosecution which would prompt the defendant to set fire to this building is that the defendant's wife and brother-in-law, Keady, went to Freudenheim a day or two before the fire and accused him of getting the defendant drunk. To be exact, I quote from the brief of the learned district attorney:

"There was evidence that Freudenheim quarreled with James Keady and had some conversation with Mrs. Myer the Wednesday before the fire, in regard to Freudenheim getting Myer drunk. And it further appears that Mrs. Myer in that conversation said that unless Myer straightened up she would not live with him. Here was some evidence of a reason to induce some man to get even with Freudenheim."

That might possibly furnish a motive for the defendant's wife or her brother, but I fail to see how it would induce the defendant to commit the crime, unless, of course, he was instigated to do so by his wife and brother-in-law. But there is not the slightest evidence to connect them with the fire. The only motive, so far as I can discover from the record, on the part of any one to burn this store, is over insurance. It appears that Freudenheim carried $7,000 of insurance. His last inventory showed $6,000 of stock, and there was talk just before the fire of canceling some of the insurance. But it is not claimed by the prosecution that Freudenheim procured the defendant to fire the building. Indeed, the prosecution contends that Freudenheim did not fire the building or procure any one to fire it. If the defendant had any motive for setting this fire, it is not apparent from anything contained in the record. The circumstances are quite to the contrary. As before stated, a strong wind was blowing from the northwest, so that firing the Freudenheim store would endanger other stores and dwellings to the south and southeast, including the house of the defendant.

[3] It is true, as is contended on behalf of the people, that it is unnecessary to show any motive, if the defendant actually committed the crime; but where, as here, the case depends entirely upon circumstantial evidence and upon testimony which of itself is not very satisfactory, the absence of motive is a strong circumstance in the exculpation of the defendant. As is said by Mr. Wheaton in his work on Criminal Evidence (2 Wheaton's Criminal Evidence [10th Ed.] § 948):

"Crimes are committed without any apparent motive, and while motive is never essential to conviction where a crime has been proved, still the absence of motive or all inducement to commit the crime is a strong circumstance in favor of the accused, and in cases depending upon circumstantial evidence, it is not only a matter relevant to the issue, but is sometimes a matter of vital importance."

While the learned judge who presided at the trial was eminently fair, impartial, and clear in his charge and did his best to give the defendant a fair trial, I cannot resist the conclusion that the verdict was the result of unfair acts of the counsel who assisted upon the trial of the prosecution, to some of which I will call attention.

[4] During the course of the cross-examination of the witness Wilcock, the manager of the Pinkerton Detective Agency, counsel incorporated in his question the contents of two letters, which he assumed to read and quote, asking the witness whether he did not write one of them to Mr. Lapham (defendant's attorney) and whether Mr. Lapham did not attach thereto the other note. It is true that they were excluded by the court and the jury directed to disregard them, but counsel in this way succeeded in getting their contents before the jury. After inquiring of the same witness whether he did not receive money from Keady, the brother-in-law of the defendant, or from Mr. Lapham, he asked the witness whether the reports made when the agency was working for the Vigilance Committee had been turned over to Mr. Lapham. Witness answered all of these inquiries in the negative, saying that he knew the fact to be to the contrary. Nevertheless, in sum-

ming up the case, counsel for the prosecution referred to these reports, saying:

"It would have been very interesting to you [the jury] if Mr. Wilcock and the attorney for the defendant had allowed me to present to you those Pinkerton reports, as to who set this fire, which I tried to introduce in evidence and they prevented me, and right here and now I challenge them that they don't dare present those reports to this jury."

Defendant's counsel interrupted and said: "If the court please, I except to the remarks of the counsel." To which the court replied: "Note the exception."

Further in the course of his summing up, commenting upon the failure of the defendant to call his brother-in-law, Keady, as a witness, contending that the presumption of law was that if Keady had taken the witness stand and told the truth, his evidence would have been damaging to John Myer, he called attention to the fact that the defendant had not taken the stand, saying that he was not obliged to do so unless he saw fit, but that the jury should not take his failure to do so as evidence against him, that he had no right to comment upon the fact that the defendant did not take the stand in his own behalf, but that he had a right to comment upon the fact that the brother-in-law, who was in the defendant's house that night, had failed to take the stand in behalf of the defendant. If counsel had stopped there, perhaps no serious harm would have been done the defendant, but he was not content to call attention, as he had, to the fact that the defendant had not been sworn in his own behalf; later on he adverted again to that fact, stating that the prosecution could not produce any evidence against the character or past life of the defendant, unless he was first put on the witness stand. Defendant's counsel again objected and excepted to the remark, and the court directed the exception to be noted. This was an adroit way of commenting upon a forbidden subject.

In discussing the question of over insurance, counsel claimed that the inventory showing $6,000 was made nine months or more before the fire, and then stated that at the time the fire took place he had $12,000 of stock, although there was no such evidence. This statement was objected to as not proven, and to be stricken from the record. After the court had stated, "You have your exception," counsel then consented that the statement be stricken out, whereupon defendant's counsel said, "I do not propose to·have you make those statements." The court replied, "It may stand on the record." But it is unnecessary to pursue this subject further. It is very apparent that these statements were not made inadvertently, but with the deliberate purpose of getting before the jury matters not in evidence, and improperly influencing the jury to render a verdict against the defendant. Some of these matters standing alone would not be sufficient for reversal, but in a case so close upon the facts as this is, we would not be warranted in overlooking these improprieties and holding that they were not prejudicial to the defendant. People v. Wolf, 183 N. Y. 464, 76 N. E. 592; People v. Milks, 55 App. Div. 372, 66 N. Y. Supp. 889; Steinacher v. Sayles-Zahn Co., 145 App. Div. 241, 130 N. Y. Supp. 29. The defendant was entitled to a fair trial, and that, I think, he did not have.

The judgment of conviction should be reversed, and a new trial ordered, upon the ground that the finding of the jury that the defendant set the fire is against the weight of the evidence, and because of the improper remarks and misconduct of the counsel, and that the defendant did not have a fair trial. All concur except ROBSON and FOOTE, JJ., who dissent.