# SUPREME COURT — APPELLATE DIVISION — FOURTH DEPARTMENT.

## March 13, 1919.

## THE PEOPLE v. JOHN E. TEIPER.

### (186 App. Div. 830.)

(1.) MURDER IN SECOND DEGREE—EVIDENCE SUFFICIENT TO SUSTAIN CON-
VICTION—PREJUDICIAL STATEMENTS BY DISTRICT ATTORNEY—NEW TRIAL—
CIRCUMSTANTIAL EVIDENCE.

Upon a prosecution for murder it appeared that the defendant, a young
man of good repute, left his home with his mother, brother and sister in
his mother's automobile and shortly thereafter the mother and brother
were found dead and the sister unconscious and so seriously injured that
she has lost all memory of any of the circumstances in connection with
the tragedy. All three had been assaulted; their skulls fractured and to
some extent crushed, and the mother and sister had been shot. The
defendant says he also was attacked. The tragedy occurred at about
eleven o'clock at night upon a much-traveled highway within 300 feet of
a dwelling just outside of the limits of the city of Buffalo while the
mother, brother and sister were on their way home from the defendant's
house. It was the theory of the prosecution that the defendant deliber-
ately planned the murder of his mother in order to obtain an interest in
his father's estate of which his mother had the life use.

*Held,* that the evidence was sufficient to justify the jury in finding the
defendant guilty of murder in the second degree, but the judgment of
conviction must be reversed and a new trial granted because of prejudicial
statements by the district attorney both during the trial and in summing
up after being admonished time and again not to comment upon state-
ments of witnesses and to refrain from making improper remarks.

(2.) SAME.

It is not necessary for the prosecution to establish the precise way in
which the crime was committed. If circumstances are established by
direct evidence and are such as to make a chain of facts all consistent
with and pointing only to the defendant's guilt and inconsistent with his
innocence, he may be convicted.

(3.) SAME—PRODUCTION OF ALLEGED STATEMENT BY DEFENDANT TO COUNSEL IN PRESENCE OF JURY.

It is improper to call upon the defendant in the presence of the jury, before he has become a witness in his own behalf, for the production of a statement alleged to have been given by him to his counsel.

(4.) SAME—RIGHT OF DISTRICT ATTORNEY TO READ FROM BOOK BY WAY OF ARGUMENT.

It cannot be said as a matter of law that conscious innocence has nothing to fear from the fullest revelations of the truth in every case and it is improper to permit the district attorney in summing up to read such a statement from a book.

Although it is largely in the discretion of the trial judge to permit the reading from books by way of argument, the practice is not to be commended, and in a case where it may be harmful it should not be permitted.

FOOTE, J., dissented, with memorandum.

APPEAL by the defendant, John E. Teiper, from a judgment of the Supreme Court, Erie county, rendered against him on the 22d day of December, 1916, convicting him of the crime of murder in the second degree, and also from an order of said court made on the 5th day of January, 1917, denying defendant's motion for a new trial made upon the minutes.

*Edward R. O'Malley* (*Simon Fleischmann* and *Bayard J. Stedman* of counsel), for the appellant.

*Guy B. Moore, District Attorney* of Erie County, for the respondent.

KRUSE, P. J.:

About eleven o'clock on a Sunday night in January, three years ago, the defendant, a young man of good repute, left his home with his mother, brother and sister in his mother's automobile and shortly thereafter the mother and brother were found dead and the sister unconscious and so seriously injured that she has lost all memory of any of the circumstances in

connection with the tragedy. All three had been assaulted; their skulls fractured and to some extent crushed, and the mother and sister had been shot. The defendant says he also was attacked. The jury has found that he, himself, killed his mother and has convicted him of murder in the second degree.

The tragedy occurred on the highway leading from Orchard Park to the city of Buffalo within about a mile and a half of the city line and six miles from Orchard Park, at a point where earlier in the day the defendant had left his automobile. The mother, brother and sister had visited at defendant's home during the evening and were on their way to their own home in the city when assaulted. The defendant attempts to account for his automobile being left there on the road in this way: He says he started to go to the city for ice cream; that his car stalled owing to a defective magneto brush, and he left it and walked toward the city; met his mother, brother and sister coming in his mother's car on their way to his home to spend the evening with him; that he rode home with them, leaving his car on the road, intending to return after their visit and remedy the defect in it and take it home. He says that on his return trip, after reaching the point where his car stood, he alighted and took off his overcoat. It was a dark, rainy night; he tried to use his trouble light to aid him in repairing his car but could not make it work. The brother suggested that the trouble light could be attached to the tail light of his mother's car, which stood just ahead of his own. While engaged in the darkness at work on his car he heard his brother groan and call, " Oh, Ed; " that at about the same time he, himself, was attacked. He grappled with his assailant for a short time and then lost consciousness and became dazed and bewildered. While defendant was a strong man, he testified that the man who attacked him handled him like a doll. He gives no account of the attack upon his mother, brother and sister and says he did not hear the shooting, although it undoubtedly occurred. In the tool chest

of the defendant's car were two tire irons and a hammer and he kept a revolver in a small box located between the two individual front seats of his car. It is reasonably certain that the wounds upon the victims were inflicted with some blunt instrument, or instruments like these tire irons and hammer, and that the shooting was done with his revolver.

As has been stated, the defendant left his home about eleven o'clock with his mother, brother and sister. The assault occurred about eleven-twenty. At about eleven-forty-five the defendant was discovered in the highway by four men who were on their way to the city. He was then about 75 or 100 feet from his automobile toward Orchard Park. As they came toward him he threw up his hand and called for help and he says he also asked for a doctor; as to that he is corroborated by others. The driver of the approaching automobile stopped, backed up his car into a driveway leading to the residence of William Deppeler, which is about 265 feet from where the assault occurred, and after a moment's conversation with Mrs. Deppeler, turned back without going to the scene of the tragedy or giving any assistance. Just before these four persons saw the defendant the attention of Mrs. Deppeler and others present in her home had been attracted by the shooting. She says that she heard a man " groaning awful," and she described it, and she also heard shots. She was unable to tell how many, but the testimony of others present, in connection with her own, indicates that there was first one shot and then three or four in quick succession. She says that she heard a woman's voice say, " Oh, Fred, oh, Fred, don't do that; " that she heard an awful screaming and then she ran to the 'phone and called the operator. Her testimony is corroborated by several other persons, friends and members of her family who were present, one of whom says he heard cries of " Help, help, we are being murdered," and he thinks it was a man's voice. In this connection it should be noted that Fred was the brother and not the defendant.

Officer Baker reached the scene of the tragedy about half-past twelve. The defendant was then not far from the place where the four men had seen him. As the officer approached, the defendant came toward him. The officer threw a flashlight upon him, told him he was an officer and threatened to shoot him if he did not stop, and the defendant fell upon the pavement. The officer inquired about his trouble; the defendant replied that they had all been held up; the officer said, "Where?" The defendant said: "Just below here." The officer started to go down there and the defendant said if he went down there he would get killed. The officer went on to where the two cars were standing and found the brother and sister lying upon the pavement near the left front wheel of the defendant's car, and the mother in her car sitting in an upright position on the rear seat. The mother and brother were dead and the sister unconscious. Both cars were facing toward Buffalo on the right side of the road about twenty or thirty feet apart, the mother's car being ahead of the other; one lamp on her car was lighted.

When the officer came back to where the defendant was he inquired whether Grace, the sister, was hurt, and the officer told him what he had found. The defendant was then lying on the pavement. The officer went to telephone to Dr. Flemming, after which he returned with William Young. The defendant was still in about the same place on the pavement. When they were within ten or twelve feet of him the defendant jumped up and said: "I can lick anybody." The officer told him "if he didn't stop now he would go down and out." The officer and Young proceeded on to where the automobiles were standing. The defendant's pocketbook was found on the shoulder of the road. He testified that he had thirteen dollars in it, which was gone. It also appeared that the jewelry upon the sister, Fred and the mother, and some money in Fred's pocket, had not been taken. The defendant identified the pocketbook and said that his watch was gone and that his arm

was cut. Other articles were found later. It also appears that there was a rent in the left sleeves of his coat and shirt, and that his collar was torn and soiled and that there were finger prints upon it.

Dr. Flemming arrived upon the scene about half-past one o'clock. He examined the bodies and discovered that the skulls were crushed, as has been stated. The mother had been shot through the head, the bullet entered just below the left eye and came out below the left ear. A bullet was found embedded in the seat, back of where the mother was seated, and there were also three or four bullet holes in the automobile top. The sister also had a bullet wound in her left cheek. There was little or no blood in the track of the wound in the mother's head, indicating that she was dead when shot, and it is argued that she was not in the automobile when assaulted, but that she was struck down outside of the car and then her body was put back in the automobile and the bullet fired into her head. Dr. Flemming talked with defendant about the tragedy. Defendant told him of the attack upon himself and his brother; of his struggle and loss of consciousness. Dr. Flemming says he noticed a swelling about the size of a half dollar on defendant's forehead and that he talked and acted dazed and bewildered, and he gave him two grains of caffein-citrate and told him he better come to the hospital. He said he would, but did not, and later he went home with his wife and friends in an automobile.

If the story of the defendant is to be believed, he was dazed and bewildered and did not have the full use of his faculties. It is urged that such condition accounts for his not being able to tell more of what occurred and of his lack of attention and apparent unconcern about the fate of his mother, brother and sister. It is also contended by the People that his incoherent talk and strange conduct were feigned and a mere subterfuge.

About four o'clock in the morning, after the defendant had

reached his home, the sheriff, jailer and Dr. Boyle went to his home and interviewed him. He related his story of the tragedy so far as he claimed to be able to do; told of his struggle; called attention to the swelling on his forehead; complained of soreness in the throat and other parts of the body, and called attention to the rent in the sleeves of his coat and shirt. Later in the day other physicians examined his injuries, some of whom, at least, testified that his injuries were not so serious as to account for his claimed loss of consciousness.

On the same day the district attorney, with his assistant and stenographer, went to the defendant's home and took his statement. Before doing so the defendant was informed that any statement he made might be used against him, but he volunteered to tell what he knew about the tragedy. No question is or can be made that the statement was not voluntary, or that any unfair advantage was taken of the defendant in obtaining it. The statement was not written out until the district attorney returned to his office. The next morning the defendant signed it in Buffalo. In the meantime the revolver which did the shooting had been found in a plowed field about 250 feet northeasterly from the scene of the tragedy; it and one of the tire irons and a hammer lay close together upon the ground, but were not covered. The other tire iron was found later in the field about 75 feet from the scene; when found it stood in a slanting position, one end sticking in the ground. Defendant's watch was also found in the same field, but several feet farther away, near a stone. It was battered and the hands indicated that it had stopped at twenty-six minutes past twelve o'clock.

It should be stated in this connection that other articles were found at or near the scene of the tragedy which it is claimed do not implicate the defendant, but tend to show that others committed the crime. Another hammer was found in another field on the southwesterly side of the highway, but it is claimed that the place where it lay indicated it had been there for some

time.    One or two hats not belonging to the defendant or his brother, it is claimed, were found upon the highway where the assault was committed.    It is conceded that one of the hats taken by the sheriff or district attorney is missing.    The district attorney claims it has been lost.    There was also found, on the side of the highway where the automobile stood, a red bandana handkerchief.

The revolver which did the shooting was a thirty-eight calibre revolver.    The defendant also had a thirty-two calibre automatic revolver at his home.    The defendant told the district attorney that he never had a thirty-eight calibre revolver; that he only had a thirty-two automatic.    After signing the statement the defendant became aware that the district attorney had learned of the thirty-eight calibre revolver, and that the defendant had purchased it a week or so before the assault. Thereupon the defendant admitted that he had been untruthful, stating that he thought it might incriminae him if he told about the revolver.    He also said that he carried it in the little box between the seats of his automobile, and that it was probably there on the night of the accident, as he called it; that he thought the chambers were all loaded; that he had not seen the revolver from the time he purchased it until it was shown him that day, February 1, 1916, by Mr. Dudley (who was then district attorney), at police headquarters.    He wrote out this statement, stating that it was made of his own free will and accord, voluntarily and without any threats or promises of any name or nature, and signed it.

Upon his examination on the trial he says he denied the ownership of the revolver because of the horrible thought of being accused of the crime; that he thought of his wife, and his family and his friends, and did not wish to admit any circumstance that would point suspicion his way.    He also told the district attorney, when he was being questioned at his home, that the other revolver was at the office, when in fact it was in a

27

bureau drawer at his home.    But very soon after made that statement to the district attorney he corrected his statement, and, as Dr. Myer says, admitted that he had been untruthful and told him where the revolver was, and the doctor took it from the bureau drawer.    He also admitted that his statement respecting his financial condition was incorrect.    It is urged that these untruthful statements are strong circumstances tending to implicate him, and undoubtedly they may properly be so construed.

It is contended on behalf of the defendant that these circumstances were given undue weight by the jury; that the evidence is entirely insufficient to establish any motive for committing so atrocious a crime.    It is urged that while he was owing some debts and one or two small judgments had been recovered against him, the amount of his indebtedness was trifling as compared with his financial worth; that his interest in his father's estate amounted to $40,000; that while it was not payable until the death of his mother, she having the life use of the estate, it was nevertheless a substantial, existing interest and entirely adequate to obtain credit upon and relieve whatever financial stress he was under.

Up to the time defendant was suspected of this crime he stood high in the community where he lived, and he was a man of good reputation.    He came from a good family; his father seems to have been a sturdy character, and his mother was principal of a grammar school before she was married.    He was a strong man, in good health, and had enjoyed a college education.    The relations between the defendant, his mother, brother and sister were such as to indicate a warm friendship and high regard for each other.

The undisputed evidence shows that up to the time his mother, brother and sister left his home on this fateful night not an unpleasant incident had occurred during the entire evening of the visit.    Mr. and Mrs. Thorn, friends of the defendant, were

present upon this occasion. The brothers and Mr. Thorn played pool after dinner and just before leaving for home the mother gave to the defendant a check for $100 as a birthday present.

It was the theory of the prosecution upon the trial and is urged here, that the defendant deliberately planned the murder of his mother; that he took his automobile to the place where it was found with the intention of returning with his mother, brother and sister after their visit to his home and commit murder in order to obtain the $40,000 from his father's estate, of which his mother had the life use. The jury evidently did not believe that such a man would deliberately plan to kill his own mother, and then to cover up that crime, kill both his brother and sister, and even if he was inclined to commit such a crime, that he would plan to commit it upon a much-traveled highway within three hundred feet of a dwelling just outside the limits of a populous city. It is not strange that the jury should reject such a theory, as they evidently did.

It is not unlikely that the jury thought there was a quarrel between the brothers, in which the mother and sister became involved in some way. This was suggested by the district attorney in his summing up and alluded to by the trial judge in his charge, but it is contended on behalf of the defendant that there is no evidence to support such a finding. There certainly is no direct evidence to that effect, and if it may be inferred from the circumstances, we are left entirely in the dark in regard to the nature and circumstances of the quarrel.

Mrs. Deppeler's testimony would seem to indicate that Fred, and not Ed, was about to attack some one. Who struck the first blow? Who was on the defense? How were the mother and sister involved, and what part did they take? Did either take sides in the controversy, or were they attempting to separate the boys if a fight was in progress? And, finally, who struck the blow that killed the mother, was it intentional or an acci-

dent? No answer to these questions came from the voluminous record which lies before us.

But it is not necessary to show that there was a quarrel, or to establish the precise way in which this crime was committed, nor the circumstances which led up to it. His guilt need not be established by direct evidence. If circumstances are established by direct evidence and are such as to make a chain of facts all consistent with and pointing only to his guilt, and inconsistent with his innocence, he may be convicted. (People v. Razezicz, 206 N. Y. 249, 28 N. Y. Crim. 254.)

There are other circumstances which have more or less bearing upon the guilt or innocence of the defendant, but it is enough to say that in our opinion the evidence is such as to take the case to the jury and justify a finding of the defendant's guilt. If it were not for errors committed upon the trial, which we believe necessitate a reversal, we would feel bound by the verdict of the jury.

Many exceptions were taken by defendant during the course of the trial. Some are without merit. A few require some attention. While we reject the conclusion that the verdict is not without evidence to support it, we think the circumstances were such as to entitle the defendant " to a scrupulously fair trial," as was said by the Court of Appeals in People v. Esposito (224 N. Y. 372). In the opinion in that case Chief Judge HISCOCK says: " Under the circumstances disclosed by the foregoing brief summary it is manifest that the defendant was entitled to a scrupulously fair trial. It was the duty of the court and of the district attorney to see to it that his fate which hung in the balance for so long was not prejudiced or settled by any forbidden or untoward methods. It was immaterial that one might think that the defendant was guilty of the highest crime of which he could be convicted and that there was no danger that such a conviction would result in meting out to him greater punishment than he deserved. Such thoughts as these,

if they existed, had no place in the presence of that fundamental principle of our jurisprudence that a man shall not be punished for an act, however abhorrent and criminal it may seem to be, until he has been justly and fairly convicted."

The learned judge who presided at this trial endeavored to give the defendant such a trial, but we think that the conduct of the district attorney was such as to thwart that purpose. He was admonished time and time again not to comment upon statements of witnesses and to refrain from making improper remarks, but he did not heed the admonitions of the court. The fact that he may have believed, and even had good ground for his belief, that the defendant was guilty did not justify him in constantly and improperly injecting his belief into the case and in making improper remarks during the progress of the trial so as to prejudice the jury against the defendant and improperly influence their verdict.

While the defendant's father-in-law was being cross-examined the district attorney inquired how the defendant got from the bathroom to the defendant's bedroom. The witness replied that he thought he walked, whereupon the district attorney said, " Of course. Don't be funny when your son-in-law is on trial for murder." The witness replied that he did not know how he could get there any other way, whereupon the district attorney said: " This is a serious matter. They might have taken an airship." The witness replied, " Possibly," whereupon the district attorney said, " That you have been using up to this time?" Here the court intervened, stating that he would not tolerate such comments; that there was no excuse for them; that he would have his say with the jury when the time came. After further colloquy between the judge and the district attorney, the district attorney was finally directed to observe the admonitions of the court.

Again, when the witness Abbott was being cross-examined, he was asked whether he had ever heard of anybody having

an accident to an automobile and fixing it and taking it home. The witness answered, " Yes," whereupon the district attorney said, " Sure.    That is all.    By the way, there wasn't anybody killed out there at that time, was there? "    The witness replied in the negative, whereupon the court, of its own motion, said: " Leave that out, Mr. Moore (district attorney), I don't think that is proper comment to make in a case of this kind."    Defendant's counsel asked the court to instruct the jury to disregard it.    The court said: " Disregard it and let it not be repeated.    It is not proper."

A witness who had testified about seeing a colored man on the Sunday of the tragedy, was asked upon redirect examination whether on the next day there was not published in a newspaper a statement that a colored man was seen in that vicinity, whereupon the district attorney said: " Counsel knows that that is not proper.    He has tried this case pretty well in the newspapers, but he cannot try it in the newspapers in this court room, not while I am here."    The record in this case is entirely barren of any facts to justify such an assertion.

At another time the admissibility of certain evidence offered by the defendant was being discussed; the court said, " It comes to pretty near being hearsay," whereupon the district attorney remarked : " That is all it is, and that is all we have had right along, hearsay, gossip."    The court again admonished the district attorney, and upon request of defendant's counsel, the jury were told to disregard the remarks.

Grace Teiper, the sister of defendant, was being examined as to the receipts and disbursements of her mother; the district attorney objected on the ground that it was hearsay, stating that the woman was dead and the testimony could not be contradicted anyway, and that the witness was mentally incompetent.    Whereupon defendant's counsel said: " Now, I want to take an exception, if your Honor please, to the constant persistent remarks made by the District attorney as to the incom-

petency and the mental condition, describing this witness's mind here before the jury," and asked that the jury be instructed to disregard the statement. The court instructed the jury to disregard what either counsel had said and stand on the testimony. The district attorney then said: "If that is so, your Honor, then I ask the court to instruct the jury to disregard Dr. Putnam's testimony as to her mental condition." The court said: "No, I have ruled." The district attorney then said: "He testified to it, I did not." The record fails to show any such testimony upon the part of Dr. Putnam. What he testified to was not that she was mentally incompetent, but to her loss of memory of the occurrences at the time of the tragedy, resulting from blows upon her head.

Upon cross-examination of defendant, he was asked whether he had played football and taken part in theatrical performances, and whether he was not something of an actor and the witness replied: "The people didn't seem to think so that I performed before." Whereupon the district attorney said: "That may be the result before we finish here." The record is full of incidents of this kind, but enough has been said to show their nature. There are, however, one or two which deserve attention.

Baker, the officer, and an important witness for the prosecution, had admitted upon cross-examination that he refused to tell defendant's counsel what he knew about the case because, as he stated, the district attorney had told him not to talk about it. It appeared that he had made a written statement to the district attorney and counsel asked the district attorney whether he would let him read it, to which the district attorney replied that he would if counsel would let him see the memorandum that the defendant had given him. Up to this time the defendant had not become a witness in his own behalf. This statement of the district attorney is complained of, because, as it is claimed, it implied that the defendant had made such a

statement and if produced would disclose matters prejudicial to the defendant. There was no evidence of any such statement and if there had been, it was improper to call upon the defendant for its production in the presence of the jury. (People v. Gibson, 218 N. Y. 70; People v. Minkowitz, 220 id. 399.)

In the course of the examination of the father-in-law of the defendant, he was proceeding to narrate, without objection, a conversation he had with the mother of the defendant about purchasing a brick plant. The district attorney inquired of the court as to whether it was competent, to which the court replied that he supposed it was not if the district attorney objected to it, whereupon the district attorney said he would not object. After proceeding further the district attorney again interrupted, saying that if this was competent he could also prove what the mother had said to people when the defendant was not there. After a prolonged colloquy the incident was closed with the statement by the district attorney that he objected since defendant's counsel would not make that agreement. This and the preceding incident referred to is claimed to be highly prejudicial to the defendant, especially in view of the district attorney's comment in summing up, in which he accused defendant's counsel of trying to hide facts and keep things out of the case.

One other incident occurred in the summing up which deserves some consideration. The district attorney, after commenting upon the untruthful statements of defendant, read from a book, saying that a great writer on the law of evidence had said: " Conscious innocence has nothing to fear from the fullest revelation of the truth. The intentional fabrication of false, inconsistent or contradictory explanations of suspicious circumstances or the employment of evasion, equivocation or falsehood to divert a careful investigation into the commission of the crime or the connection of the accused with it is always

relevant and proper, for it may with reason be presumed that an evil intention permitted the effort to hide the truth."

Defendant's counsel took exception to this, saying: " I take exception to the reading of that passage as improper, the opinion of some text writer on that subject, and I ask that the jury be instructed to disregard the opinion of some text writer as to the workings of people's minds." The district attorney replied that it was entitled to as much weight as some utterances that a judge made at a picnic at Olcott Beach that counsel had quoted the day before. The court directed the district attorney to proceed and the defendant's counsel took an exception. While it is true that defendant's counsel in his summing up referred to a statement made by Judge CHILDS at a picnic, it would not justify the district attorney in reading from a law book if it was improper for him to do so.

I have no doubt it would have been entirely proper for him to argue along the same line as the text writer and in the same identical language, but he should not have been permitted to give additional weight and sanction to the argument by reading from a law book. Of course, if the proposition read was correct as a rule of law, and could have been properly charged by the judge in this case as a rule of law, no harm could result, but I think it cannot be said as a matter of law that conscious innocence has nothing to fear from the fullest revelations of the truth in every case. Whether that was done in this case was a question for the jury and it could not be charged as a rule of law. The reading of law by counsel has been frowned upon. (Lesser v. Perkins, 39 Hun, 341, cited with approval in Ryan v. Porter Mfg. Co., 57 id. 253; Griebel v. Rochester Printing Co., 24 App. Div. 288, 291.) Undoubtedly it is largely in the discretion of the trial judge to permit that to be done by way of argument, but the practice is not to be commended, and in a case where it may be harmful, as I think it was here, it should not be permitted.

Attention has frequently been called by the Court of Appeals to the status and conduct of prosecuting officers, and it may not be amiss to quote from one of the opinions of that court: The district attorney " is a quasi-judicial officer, representing the People of the State, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment." (People v. Fielding, 158 N. Y. 547.)

Many cases might be cited where a new trial has been ordered for the failure of the prosecuting attorney to keep within the spirit of the rule just stated. Some of the more recent cases are: People v. Trybus (219 N. Y. 18) ; People v. Myer (164 App. Div. 296, 32 N. Y. Crim. 205).

If prosecuting officers persist in violating this rule and the defendant is prejudiced thereby, a conviction will not be permitted to stand. The district attorney may have intended to be fair; he so stated repeatedly upon the trial; but his zeal seems to have overcome his good intentions. Even if prompted by the best of motives, if such conduct was harmful to the defendant, as I think it was, it cannot be overlooked. The defendant was entitled to a fair trial, and that I think he has not had, notwithstanding the great patience and care exercised by the presiding judge to that end.

I think the judgment should be reversed and a new trial ordered, because of errors committed upon the trial, and upon the specific ground before stated.

All concurred, except Foote, J., who dissented in a memorandum, and De Angelis, J., not voting.

Foote, J. (dissenting):

I dissent and vote for affirmance. The question of defendant's guilt was clearly a question for the jury as the opinion concedes and as appears from many circumstances pointing to his guilt in addition to those stated. I think the defendant had a fair trial and that the conduct of the district attorney which alone is criticized was not so prejudicial as to justify a reversal.

Judgment of conviction and order reversed and new trial granted; the said reversal is solely for errors of law and not for errors or questions of fact or as a matter of discretion; this court having reviewed all questions of fact and found no error therein.