THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MICHAEL J. ENRIGHT, Appellant.

Fourth Department, May 4, 1927.

Crimes — manslaughter, first degree — evidence on part of prosecution established beyond reasonable doubt that defendant committed crime — jury was justified in rejecting defendant's testimony as false — no error was committed in cross-examination of defendant — no harm was done when expert in answer to hypothetical question as to whether wound on head of decedent " could " have been caused by axe in evidence, answered, " My opinion is that it did "— introduction in evidence of defendant's loaded revolver without objection, was not harmful — fact that number of witnesses in giving testimony incidentally repeated casual remarks made by others in and around defendant's house while investigation was under way, did not constitute prejudicial error — remarks by district attorney in summation were not prejudicial.

The defendant, who was convicted of the crime of manslaughter in the first degree, lived alone in a farm house and, a short time before the alleged crime, employed decedent to help him. The evidence shows that the crime was committed on the morning of December 10, 1925, and that both men had been drinking the night before; that two large spots of blood were found on the porch of the house and another in front of the house; that the body which was found lying along the roadside in front of the house was warm when inspected by a State trooper about ten o'clock in the morning; and that the body was not there at nine o'clock in the morning. The evidence also shows that there was blood on defendant's clothing and some blood in the house. Evidence by the prosecution established defendant's guilt beyond a reasonable doubt.

Defendant's testimony was contradictory and inconsistent and did not agree with prior statements made by him. Under the circumstances the jury was justified in rejecting his testimony as false.

No error was committed by the prosecution in asking the defendant on cross-examination if he had had quarrels with or had fought with or assaulted certain

persons, for the district attorney did not attempt to disprove his negative answers and the testimony was directed merely to the credibility of the witness. The scope and extent of such testimony is within the discretion of the presiding judge and no error was committed on the cross-examination.

Prejudicial error was not committed by the coroner, testifying as an expert witness, who in answer to a hypothetical question as to whether the wound on the decedent's head " could " have been caused by the axe in evidence, it appearing that the decedent was killed by a blow on the head, answered, after an objection had been overruled by the judge, that in his opinion it " did." It appears that the answer was understood, no motion was made to strike it out and defendant's counsel immediately took the witness on cross-examination during which the point was cleared up, and furthermore, the next expert witness who was asked the same question answered that " it could."

It was not prejudicial error to admit in evidence a loaded revolver which was found on a chair in defendant's bedroom, for it had no probative force, and furthermore, was admitted in evidence with the consent of defendant's counsel.

The fact that several witnesses in giving their testimony incidentally repeated casual remarks made by others in and around the defendant's house while the investigation was under way on the morning of December tenth, does not constitute reversible error, for it would be possible to say on the evidence that all the remarks so testified to were made in the presence of defendant. Furthermore, the remarks were so trivial and of so little consequence as to be of no harm.

The judgment will not be reversed on the ground that the district attorney in his summation made inflammatory remarks which prejudiced the jury against the defendant, for, although the remarks by the district attorney might well have been milder in tone, it cannot be said that they were inflammatory to the point of being prejudicial.

CLARK, J., dissents, with opinion.

APPEAL by the defendant, Michael J. Enright, from a judgment of the County Court of the county of Steuben, rendered on the 25th day of February, 1926, convicting him of manslaughter in the first degree.

*Thomas F. Rogers* [*Herbert A. Heminway* of counsel], for the appellant.

*Guy W. Cheney, District Attorney,* for the respondent.

CROUCH, J.  For some weeks prior to December 8, 1925, the defendant lived alone in a farm house owned by his brother, located on the south side of what was known as the back road leading from Curtis to Campbell, in the town of Campbell, Steuben county. On that day in the afternoon Timothy Shea came there, having been hired by defendant to help him with some work about the place for a week or two.  Between nine and ten o'clock on the morning of December 10, 1925, the dead body of Shea was found at the side of the road in front of the house.  On his face were several more or less superficial wounds and much blood.  On the top of his head was a wound half or three-quarters of an inch in diameter extending down to the underlying tissues of the skull

but not penetrating through the scalp. His hands and wrists were swollen and discolored. There was an abrasion on the back of the right hand.

For having killed Shea the defendant has been convicted of manslaughter in the first degree. The appeal here is from that judgment of conviction.

The medical testimony leaves no doubt that the cause of Shea's death was concussion and hemorrhage of the brain, resulting from the impact which made the wound on the top of the head. The jury has found upon circumstantial evidence that the impact was a blow struck by the defendant. The first question to be determined is whether, within the rules applicable to that kind of proof, that finding can stand.

The Enright house was a two-story frame building fronting north. In front of the L was a porch four feet seven inches wide. The front door from the porch led into the kitchen, which extended entirely through the L with a back door opening directly out of it. Through the east wall of the kitchen was a door which led to a small bedroom. The cook stove was on the east side of the kitchen and opposite, on the west side, was a kitchen table. There was a small stand in front between the door and a window. At the back and near the back door was another stand. Beyond the kitchen table was a stairway, and beyond that was a pantry.

There was a path about sixty-six feet in length leading from the road directly to the front door. Near the path at the roadside was a mail box. There was a driveway leading from the road a short distance east of the house. The roadway in front of the house was slightly dug out, so that at the edge of the road, bounding the front lawn, was an embankment eighteen inches high. The body when found lay at the foot of that embankment about midway between the mail box and the drive.

Defendant slept in the small bedroom off the kitchen. Both men went to bed the first night about seven o'clock. On the morning of December ninth they rose about seven-thirty, had breakfast and both took a drink of whisky out of a bottle belonging to Shea. After breakfast Shea started out to notch certain trees. Between nine and ten o'clock defendant went to the Abbott house, located about thirty rods west on the road, to get some buttermilk. There he found Shea, who said he had come up to grind his ax. Defendant said: " I thought I left you cutting wood." They went back to the Enright house together, and a little later were seen driving together along the road to the Erie station, where defendant took the train to Corning. Shea drove the rig back from the station alone. While in Corning defendant bought a pint bottle of whisky,

and took one drink there. He says he then discovered that he had left his vest, with $180 in it, at home, and fearing that Shea or somebody else might take it, he hired a taxicab and was driven home, arriving about three o'clock in the afternoon. On the way he had expressed his fear to the driver of the taxicab. Upon arrival he went at once into the house, found the money, came out, paid the driver, and said that he guessed Shea had been washing dishes. Neither Shea nor defendant was seen by anybody thereafter, so far as the evidence shows, until the following morning, December tenth.

On that morning, about nine-thirty-five or nine-forty A. M., two young men, driving a team west on the back road, passed the Enright place. They saw the body as it lay by the roadside. They did not stop until they reached the Abbott place, where they told Mrs. Abbott what they had seen. They then drove on to Campbell, where they again told of seeing the body. Meanwhile Mrs. Abbott had informed her next neighbor west, whose name was Root, of what the young men had told her. Root at once hitched up, and in company with his wife, drove down to the Enright place, saw the body, passed beyond it as far as the driveway where he turned around and proceeded toward home without stopping. As he passed on his way home, he saw defendant on the porch wearing an overcoat, and later he looked back and saw defendant going from the porch down toward the road. Shortly thereafter defendant appeared at the Abbott house and told Mrs. Abbott that there was a dead man down there and that he thought it was Mr. Shea. Something was said about notifying the authorities, and defendant started out along the road to Campbell. On the road about a quarter of a mile west of the Enright place, defendant was met by an automobile containing a State trooper and two other men who were on their way to the place where they had been told the body was lying. Defendant, at the suggestion of the trooper, got in the car and went back with them. When they arrived, the trooper pulled back the dead man's clothing and put his hand on the left breast. He found the body warm, but there was no sign of life.

There was little or no blood where the body lay. But from the bank in a zigzag direction leading toward the porch was a trail of blood consisting of five or six spots as big as a hand or half as big, with smaller spots or traces in between; and to the east of the steps leading to the porch and out from the base of the porch about two feet and a half was a large spot about ten inches in diameter, lying in a saucer-like depression in the ground. On the porch itself and to the east of the front door were two large blood spots. One, about twelve inches across at its widest point, was out about eight

inches from the siding; the other was about three feet back from the front edge of the porch. There were two other spots about six inches wide nearby, and other smaller stains in the vicinity. In the kitchen there was found in front of the stove a piece of burlap on which was a wet blood stain an inch square. On the small stand at the back of the kitchen was a towel rolled in a ball, upon which there was some blood. Outside of the back door was found a single-bitted ax, one flat side of which showed a patch of blood similar in color to that on the front porch, and on the helve near its junction with the blade was blood and hair and some tissue. On defendant's pants below the knees there were streaks of blood. And on one cuff of his shirt was a blood spot. When asked how he accounted for it, defendant looked down at the blood and made no reply.

The blood in the yard, on the porch and on al of the articles above referred to except the towel, was shown to be human blood, and the hair on the helve of the ax was shown to be human hair. The stains on the towel were identified as blood, but the expert was unable to say that it was human blood because, the towel having been wet, mould had broken down the corpuscles so that they could not be identified. On the large kitchen table were found two plates which had the remains of food on them, apparently cabbage, two cups and saucers, some knives and forks, and several other dishes. The cups had dregs of coffee in them. In the pantry was a loaf of bread, a dish of pancake batter, and an open package of ground coffee. An examination of the contents of Shea's stomach, subsequently made, disclosed boiled cabbage and onions, largely undigested.

As to all of the foregoing facts, there is substantially no dispute, and the evidence, in any event, is sufficient in our judgment to establish them beyond a reasonable doubt.

The story of the defendant covering the period between his arrival at home from Corning about three o'clock on the afternoon of December ninth and the discovery of the body on the morning of December tenth, is substantially as follows:

He found Shea, his bottle of whisky empty, drunk on the floor of the kitchen in front of the stove. There was a clot of blood in his nostrils and around his lip. In getting up, Shea took hold of defendant's pants to help himself. After he was up and sitting in a chair, they talked, and both had a drink of whisky from the bottle defendant had brought from Corning; and after a while they had another.

About half past four defendant went out to the barn to water the horse. The horse threw his head around and hit defendant in

App. Div. 26|          Fourth Department, May, 1927.

the face, causing his nose to bleed slightly. He wiped it off with his finger — " there wasn't much to wipe "— and then wiped his hands on some hay. At supper time defendant put the cabbage and meat out of the kettle on two plates. The cabbage and meat had been prepared and put in the kettle on the stove in the forenoon, and had remained there. Shea said he wanted no supper, so defendant put back in the kettle what was on Shea's plate. Shea said that he would wash the dishes, but defendant does not know whether he actually did wash them or not. Shea told him he had cut his finger and he had a rag in one hand. There appeared to be a little blood on the finger. After reading the paper for a while, defendant left the house to go to the home of a man named Shufelt near the railroad tracks in Campbell. When he left, Shea was sitting in a chair. Defendant took his own bottle of whisky with him. When he got to Shufelt's, he did not see Shufelt around the yard. There was a light in the house, but defendant thought Shufelt's wife would not want him in the house, so he came back by the way he had gone. That was across lots to the railroad, and thence along the tracks. He saw nobody, nor was he seen by anybody on that journey. While he was gone, he drank all the whisky that was left in the bottle and threw the bottle away.

When he got back, he went into the house by the back door. The light was still burning; Shea was not there. He looked in the bedroom, which was empty. Then he went to the back door and called Shea, and getting no response, shut but did not lock the back door, locked the front door, and went to bed. That was about eight o'clock.

He heard nothing during the night. He got up about seven o'clock on the morning of December tenth. Shea was not there. He started a fire, went to the barn and fed the horse, ate only a sandwich for breakfast because he did not feel very well, found Shea's cap on the stand, and being curious, went out to the barn and up into the hay mow to see if Shea was there, and also looked in the toilet, but did not find him; spent some little time fussing around, but does not know what he did; and then came back to the house.

Through the window he saw somebody turning around in the lane with a horse and a buggy. He went to the front door, unbolted it, stepped out onto the porch to see who they were, said nothing to them since they did not speak to him, and then stepped back into the house for a moment. Then being curious to see who they were, he went out again off the porch and nearly down to the mail box and looked up the road. Then he looked around, and saw Shea lying in the ditch. He made up his mind Shea was dead, went into the house, shut the doors, came out and went up to the

road to the Abbott place thinking they had a telephone and intending to send word to the coroner. His evidence is conflicting as to when he first noticed the blood on the porch. His final word on cross-examination was that the first time he saw blood on the porch was when he walked up there with the trooper after the body was discovered. He found that the Abbotts had no telephone, left, and started for Campbell, and on the way he was met by the automobile and taken back to the house. He says he never had any trouble with Shea and did not know how Shea got hurt.

The jury rejected that story because in many respects it was improbable and unconvicing on its face; in other respects it conflicted with statements made by defendant before he had time for mature reflection; and in still other respects it was irreconcilable with established facts.

Shea's departure from the house while defendant was absent, defendant's ignorance of his return until he saw the body by the roadside, were the essential facts upon which the defense rested. Given the presence of the two men together in and about the house on the night of December ninth and the early morning of December tenth, it could be said beyond any reasonable doubt, in view of all the other evidence, that defendant had struck the fatal blow.

That defendant near his usual bedtime on a cold night should have gone to Shufelt's at all is very improbable. His mission was nowise urgent. But that he should have gone there, on a definite mission, and then for the reason given should have returned without any attempt to speak to Shufelt, is highly improbable. His early statements the following day not only make no mention of that journey, but indicate pretty clearly that it was not taken. To one of the troopers he said that after supper they had several drinks and that he went to bed about seven or eight o'clock, leaving Shea on the floor. To the other trooper he said that after supper they got pretty drunk and he himself went to bed about seven or eight o'clock and left Shea drunk on the floor. To another witness he spoke about drinking the night before and about his going to bed about eight o'clock and not seeing Shea after that. Finally the evidence tending to show that the supper dishes of December ninth were washed, taken with the evidence showing the number and condition of the dishes on the kitchen table on the morning of December tenth and the evidence showing the character and the undigested condition of the stomach contents, leave no reasonable doubt that the two men had breakfast there together that morning. Moreover, Shea's cap was in the kitchen, and his overall jumper was in the bedroom. It is difficult, too, to understand how defend-

ant could stand on the front porch and pass in and out of the front door several times without seeing the blood almost at his feet.

We think the jury found properly that defendant's story was false. That falsity justifies the inference of a guilty presence and of guilty knowledge.

We do not know how or exactly when the body came to be at the road side. Nor do we think such knowledge essential to conviction. A witness driving an automobile and in a position to see, passed the spot shortly after nine o'clock on the morning of December tenth. He saw nobody there. About half an hour later it was there. And when, within the next hour, the authorities arrived, that body was still warm and limber.

The limits of an opinion do not permit a detailed discussion of all the evidence. But the evidence in all its details has had our painstaking consideration and so far as the facts are concerned, we see no reason to disagree with the verdict.

Certain alleged errors of law and certain alleged acts of misconduct by the district attorney on the trial are pressed to our attention as ground for reversal.

The defendant took the stand as a witness in his own behalf. On cross-examination he was asked if he had had quarrels with or had fought with or assaulted or threatened to assault certain persons on certain past occasions. His answer in each case was a denial. The persons named or some of them were in the court room at the time under subpœna by the People. They were not, however, called as witnesses. The district attorney recognized that the prosecution was bound by the answers given and no further reference was made to those matters. The cross-examination was directed to the credibility of the witness and its scope and extent were within the discretion of the presiding judge. There was no error or impropriety committed in this connection, and we deem it unnecessary to discuss the many cases cited in the briefs, most of which are only remotely, if at all, in point.

The coroner as an expert witness for the People was by hypothetical question asked for his opinion as to whether the wound on the head *could* have been caused by the ax in evidence. An objection was interposed, overruled and an exception taken. By that time the form of the question was evidently out of the mind of the witness and his answer was, " My opinion is that it did." It is clear that the answer was understood as expressing an opinion on the possibility and not on the fact, for no motion was made to strike out and defendant's counsel immediately took the witness on cross-examination, during which the point was cleared up.

3

Fourth Department, May, 1927.          [Vol. 221

Moreover, the next witness, also a doctor, was asked the same question and answered " could," not " did." We think no harm was done.

During the search and examination of the Enright house following the discovery of the body, a loaded revolver was found on a chair in defendant's bedroom. The fact of the finding was testified to without objection and the revolver itself put in evidence with the express consent of defendant's counsel. It was stated in open court that the revolver had no probative force one way or the other and went in merely as part of the picture. The point is without merit.

Error is also urged in that a number of witnesses in giving their testimony incidentally repeated casual remarks made by others in and around the Enright house while the investigation was under way on the morning of December tenth. It would be possible on the evidence to say that substantially all of those remarks were made within the hearing of defendant. But even though that were not so, they are so trivial and of such little consequence, being used by the witnesses merely in carrying their narrative, that no error could be predicated on them.

Finally, attention is called to various statements made by the district attorney in his closing address to the jury and a vigorous charge is made that he was over-zealous. We have been told that " we must not forget that the prosecution of crimes cannot be conducted in the carefully weighed and measured language of judicial opinions. The precise latitude within which prosecutions may properly be presented cannot be circumscribed by any exact standard, for no two cases are alike, and the courts have neither power nor inclination to regulate the manners and methods of district attorneys, so long as they do not openly offend against professional propriety or interfere with the due and orderly administration of criminal justice." (*People* v. *Sexton*, 187 N. Y. 495, 508.) The rule is necessarily flexible and each case must stand on its own facts. We have not the benefit of knowing what was said by counsel for the defense in summing up, for the record does not contain his address. One may surmise that a considerable part of the prosecution's address, now objected to, was evoked by the preceding address. But no objection, so far as the record shows, was made at the trial. Calmly considering the printed text, one may agree that good taste would dictate the modification or omission of several statements appearing therein. We do not think, however, that they can justly be described as inflammatory, nor do we think that they in anywise interfered with the due administration of justice.

Upon the whole, therefore, we find no substantial error of law or fact and think that the judgment of conviction should be affirmed.

All concur, except CLARK, J., who dissents in an opinion and votes for reversal and granting a new trial.   Present — HUBBS, P. J., CLARK, SEARS, CROUCH and TAYLOR, JJ.

CLARK, J. (dissenting).   I dissent and vote for reversal and a new trial on the ground that the persistent indulgence of the district attorney in inflammatory remarks in his summary to the jury tended to create such a prejudice against the defendant, and to inspire fear in the minds of the jury in case they did not convict, that a new trial should be had in the interests of justice.

Such remarks were not justified by any language claimed to have been used by defendant's counsel, and which are not shown by the record.

The learned district attorney in his zeal to obtain a conviction at all hazards was led into the use of language which tended to show that he was not impartial but was a strong partisan.   His reference to the fact that defendant could appeal and have any errors corrected, whereas if there was an acquittal the People had no relief, was prejudicial to defendant's right to a fair and impartial trial, and in my opinion constituted reversible error.   (*People* v. *Esposito*, 224 N. Y. 370, 376.)

That language in effect suggested to the jury that no harm could come to defendant even if his conviction was the result of errors, because they could be corrected on appeal, whereas if because of an error there was an acquittal the People had no right to appeal. This remark was highly prejudicial to defendant, and in and of itself requires a new trial.   (*People* v. *Esposito, supra.*)

The statement of the district attorney in his summary, " The People of the county of Steuben are watching you," tended to terrorize the jury and force them to render a verdict of guilty to escape the wrath of the public.

We cannot assume that this inflammatory language did not affect the jury in their final deliberations.   If the evidence of defendant's guilt had been overwhelmingly in favor of the contention of the People, so that we could fairly assume that the language of the district attorney did not tend to prejudice the jury against defendant, the error might be overlooked on the theory that his rights were not affected.   (Code Crim. Proc. § 542.)

In this case where the evidence to connect defendant with the commission of the crime charged was wholly circumstantial and where there was an entire absence of motive, the prejudicial language

used by the district attorney ought not to be overlooked. It was of such an inflammatory nature that it tended to create a situation where the verdict was based more upon passion and prejudice than upon the evidence.

Under the circumstances it is my opinion that defendant was not accorded that fair and impartial trial to which he was entitled under our system of administering the criminal law. (*People* v. *Teiper,* 186 App. Div. 830.)

The judgment of conviction should be reversed, and a new trial granted.

Judgment of conviction affirmed.