## UNITED STATES v. BENNETT et al.

### No. 82.

Circuit Court of Appeals, Second Circuit.

Nov. 15, 1945.

---

FRANK, Circuit Judge, dissenting.

———◆———

Henry K. Chapman, of New York City, for appellant.

John F. X. McGohey, U. S. Atty., of New York City (David Hartfield, Jr., Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The appellant was tried in the District Court for the Southern District of New York on an indictment charging that she and one George Wesley Bennett conspired together and with others unlawfully to acquire, possess and transfer gasoline ration coupons in violation of the provisions 50 U.S.C.A.Appendix, § 633 and of the rules, regulations and orders duly adopted and promulgated pursuant thereto by the Office of Price Administration. It was alleged to be a part of the conspiracy that the appellant would steal gasoline ration coupons from the First National Bank of Poughkeepsie, New York; transfer them to Bennett; and share with Bennett the money obtained from the sale of them. After a trial by jury both the appellant and Bennett were found guilty and she has appealed from the judgment and sentence imposed upon her.

She relies wholly upon claimed error in the charge as ground for reversal and to understand the significance of that it will be helpful now to refer to what is called in the record on appeal the "Stipulation of Agreed Facts" which follows:

"It is hereby stipulated and agreed by and between the appellant and the United States Attorney for the Southern District of New York that the following constitutes a narrative statement of facts in the case of United States v. Verna Mae Bihn and George Wesley Bennett. The parties to this stipulation agree that the facts mentioned hereafter are accurate, but neither party is precluded from referring to additional facts in the record on the argument of the appeal.

### Statement of Facts

"Appellant Verna Mae Bihn, the defendant George Wesley Bennett, and the husband of Mrs. Bihn, lived in the same three room apartment in Poughkeepsie from some time in August 1943, until February, 1944, at which time Bennett left the Bihn household to get married (Ex. 9). Mrs. Bihn was employed during this period of time at the First National Bank of Poughkeepsie. Her duties there during the greater part of her employment which extended from late summer of 1943 until the first part of September 1944, were in the main connected with rationing and the necessary bookkeeping attached to the rationing functions which the bank undertook on behalf of the Government (79).

"During the period when Bennett was living in the Bihn household, Mrs. Bihn on many occasions would bring home gasoline ration coupons. When Mrs. Bihn's husband was not present, Mrs. Bihn would give these coupons to Bennett. Bennett would take these coupons, sell them, return home and divide the money received from the sale of these coupons with Mrs. Bihn (Exs. 9, 47, 41). Sometimes Mrs. Bihn would bring home loose gasoline ration stamps and sometimes she would bring home gasoline ration stamps already affixed to gummed O. P. A. forms called O. P. A. Forms R 120 (known in the gasoline trade as 'bingo' sheets). Mrs. Bihn brought these stamps home to Bennett on approximately ten occasions. The average amount of coupons which she brought home was between 300 and 500 gallons each time. The largest amount of coupons that Mrs. Bihn ever brought to Bennett was between 500 and 600 gallons. When these coupons were affixed to 'bingo' sheets, Mrs. Bihn would soak these coupons in water and give them to Bennett to sell after they had been removed from the gummed 'bingo' sheets on which they had been affixed (Ex. 9).

"When Bennett moved to his new home in February, there were resident in this new home, in addition to his wife, the witnesses Sussana Howe and Janna Howe, respectively, the mother-in-law and sister-in-law of the defendant Bennett (3, 61).

"One Sunday in May of 1944, Mrs. Bihn approached the home of the Bennetts and remained outside (5). Mrs. Howe asked her to leave. There ensued an altercation during which the co-defendant Bennett, Mrs. Howe, Janna Howe and Mrs. Bennett were present. Mrs. Howe told Mrs. Bihn that 'if she didn't leave us alone, I would be forced to notify the F. B. I., that I thought they would be very interested in the gasoline coupons and others she was stealing from the bank.' Mrs. Bihn replied: 'Go ahead. Your son-in-law is in it just as deep as I am and if I go to prison he will go too' (6, 63, Ex. 9).

"Mrs. Howe knew about the coupons which Mrs. Bihn had stolen because she and both her daughters (Mrs. Bennett and Janna Howe) had seen her son-in-law Bennett have in his possession in her house hundreds and perhaps thousands of coupons of all sorts (162, 8, 3, 4, 52, 53). Both she and her daughters had asked Bennett how he came to have these cou-

pons, and Bennett replied that Mrs. Bihn gave them to him (58).

"Shortly after the quarrel on Mother's Day, Mrs. Bihn wrote a letter to the co-defendant Bennett, and enclosed a carbon copy of that letter in a separate envelope, addressed to Mrs. Howe (5, Ex. 1). Amongst other statements in that letter was a reference to the quarrel which took place on Mother's Day, and the following is contained in that letter: 'I didn't miss the crack about the F. B. I. Looks to me like you are trying to break into prison with your bare hands. Don't worry I can take it. I haven't much more than that now. But I think confining you will hurt you worse than it will me' (Ex. 1).

"Bennett stated to several of the Government witnesses that all the coupons he received he got from Mrs. Bihn (36). On another occasion he said that all the coupons he got were from a girl 'he was fooling around with that worked in the bank.' The girl had been previously identified by the witness to whom the statement was made as Mrs. Bihn (43).

"Part of Mrs. Bihn's duties at the bank with respect to rationing was to collect all rationing coupons which had been deposited with the bank and place them in a box for shipment to the Office of Price Administration. It was also Mrs. Bihn's duty to keep books showing the amount of ration currency deposited in the bank (85). It was also Mrs. Bihn's duty to keep other bank records in respect to rationing (87-88, 86). These records were all kept accurately (95, 105). It was Mrs. Bihn's duty to check the ration deposits after she had received them from the bank tellers (93, 98), and it was also her duty to keep the custody and control of the ration currency after it had been deposited. Mrs. Bihn did not receive the ration evidence from the clients of the bank, this was done by the bank tellers (91) but she would later check the deposits against the deposit slips. Frequently the slips were for more than the deposits actually made (92). The gasoline ration coupons were kept in a steel letter file which was locked (98, 125). The keys to this file were kept in Mrs. Bihn's desk drawer which had no lock (99, 126). Mr. Travis, the bank cashier, had a key to the steel file. Three other persons, the note teller, assistant note teller and a stenographer had access to and the occasion to go to said steel file (99, 127) and they would not ask for the key of Mrs. Bihn,

but would go to her desk and help themselves (127). Others may have gone to the steel file and taken ration tokens (99), according to Mr. Travis, and Mrs. Bihn testified that if the ration bookkeeper was not present to furnish information or ration tokens, another employee would take care of the client (127). Mrs. Bihn signed and prepared a document which represented that 156,795.5 gallons of gasoline had been delivered to the Office of Price Administration (Ex. 8, 89, 87). It was also Mrs. Bihn's duty when she had sealed the box preparatory to shipping to the O. P. A. to prepare another document on which was noted the total contents of the box with respect to each type of ration currency included therein (83-85). This document was then presented to the cashier of the bank, the witness Travis, for his signature. When the shipment was due in the forepart of September, Travis watched Mrs. Bihn prepare the box for shipment. Mrs. Bihn sealed the box and presented to Travis the document she was required to make out. This document represented on its face that there were 156,795.5 gallons of gasoline ration currency in the box (Ex. 6). Travis took the box, after having watched Mrs. Bihn prepare it, and kept it at his desk until the bank's auditor arrived that night (83). The bank's auditor examined the box and found that there were only 119,772 gallons of ration currency in the box and that there were 37,023.5 gallons missing (115).

"Subsequent to the time of indictment, and prior to trial of the case, the witness Janna Howe, the 17 year old sister-in-law of the co-defendant Bennett, received several 'phone calls at school from Mrs. Bihn who at one time said to her ' * * * I better be careful and she would be waiting for me when I got out' (66)."

While the introductory paragraph of this stipulation refers to what follows as "a narrative statement of facts" and it is stated that the "parties to this stipulation agree that the facts mentioned are accurate" they also reserved the right to refer "to additional facts in the record on the argument for appeal." It is fairly evident from this reservation that the appellant did not concede that the actual facts were as stated but that there was evidence which, if believed, would have supported findings by the jury that the facts were as stated in the stipulation. That is enough to show that there was evidence on which to submit the case against the appellant to the jury and no argument to the contrary has been made. To be sure the appellant's own testimony and other evidence she introduced, some of which tended to show that some of the government's witnesses were biased and prejudiced against her, required the jury to resolve issues as to credibility and the weight to be given the evidence found worthy of belief before it could find a verdict of guilty and perhaps not all the so-called facts in the stipulation were found by the jury. That is immaterial now since the transcript of what transpired at the trial is a part of the record on appeal. We may, and do, look to that to discover, regardless of the stipulation of the parties, whether there was sufficient, though in part contradicted, evidence to support the verdict and find that there was.

The evidence that gasoline ration coupons had been stolen from the bank was so clear and undisputed that it was a foregone conclusion that the jury would so find. The claimed error is not that the judge took that for granted in his charge. It is that he instructed the jury in effect that it must decide not only that the appellant did not steal them, but who did, before it could acquit her, thus putting the burden upon her to prove her innocence by showing the identity of the thief or thieves. If the charge is fairly open to such an attack reversible error was committed, for of course the appellant had no burden to prove anything but was presumed to be innocent and was entitled to be acquitted if the evidence as a whole was merely too inconclusive to prove her guilt to the satisfaction of the jury beyond a reasonable doubt. Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; United States v. Wishnatzki, 2 Cir., 77 F.2d 357.

After charging adequately and accurately on the burden of proof, presumption of innocence, the conspiracy as laid in the indictment and what had to be proved to establish the guilt of the appellant, the judge called the attention of the jury to the appellant's defense as follows:

"Her claim is that other people had access to these stamps. I don't know, perhaps she tries to suggest by inference that somebody else in the bank took them. But it was her responsibility to take charge of the stamps and count them and prepare this paper and see to it that this paper was

accurate, and she submitted it to the cashier for signature and this shows the number of gallons which as I said had been testified to as being short 37,000 odd gallons.

"Who would have a motive to steal them? Did she take these stamps? You have a right to consider that. She is not charged with stealing, but with conspiracy to do all these things, and you have a right to consider whether she did steal them, on the question of intent. Did she steal them? Who did if she didn't? You are to decide that. Did she turn them over to Bennett to dispose of them? You have heard the testimony of the witnesses for the Government and of the witnesses for the defendant."

The appellant's trial attorney took exception to the "charge to the jury that it is the jury's duty to find out who did steal the stamps. 'Did she? Who did if she did not? You are to decide that.' I except to that because it is not part of the jury's duty." The judge disposed of this exception by saying, "Yes, I say that was not the crime but the question is whether these defendants entered into a conspiracy to steal, possess and transfer these stamps." The attorney replied. "That is not the point of my exception, your Honor," and so the matter was left.

Although the attorney thus indicated that he knew the judge had not understood the "point" of his exception, he made no effort to make that clear. If it could reasonably be thought that any juror might have misunderstood the judge to mean that, contrary to what he had already clearly charged on the burden of proof and the presumption of innocence, the appellant was bound to prove who did steal the stamps if she did not, it would still be obvious that the attorney was apparently satisfied to take the exception he did rather than to take adequate steps to point out the claimed error, or ambiguity, in the charge. Had the experienced judge who tried this case been aware that the attorney was objecting on the ground which has been argued in this court, it is inconceivable that he would not have made it abundantly plain at once that his language should not have been so construed or misconstrued.

However that may be, the language used is not, we think, ambiguous in its setting or reasonably to be understood to mean that the appellant had the burden to prove anything as a condition upon her acquittal.

Almost in the same breath the judge told the jury that the appellant was not charged with stealing the coupons "but with conspiracy to do all these things" and that "you have a right to consider whether she did steal them, on the question of her intent. Did she steal them? Who did if she didn't? You are to decide that." The fair import of such language is not that the jury had to determine who in fact stole the coupons if it failed to find that she did but to decide whether she or someone else stole them and to consider that in determining whether she intentionally participated in a conspiracy as charged.

Judgment affirmed.

FRANK, Circuit Judge (dissenting).

1. In order to explain my dissent, it is first necessary to point to some facts not mentioned in the majority opinion. Those facts will, I think (dissipate what seems to me to be the incorrect impression created by that opinion that almost certainly appellant was guilty, as charged, of stealing the coupons and giving them to the co-defendant Bennett (who, having expressly admitted that he had illegal possession of them, was found guilty and sentenced, and who does not appeal). For the transcript of the evidence at the trial, by reference made a part of the record in this court, shows the following:

(a) The co-defendant, Bennett, did not testify; but statements made by him out of court were offered in evidence. The trial judge explicitly ruled (and correctly) that these statements were admissible as against Bennett, but must not be considered by the jury with reference to appellant, Bihn. It was, however, solely from those statements thus made by Bennett that there derives the following portion of the stipulation:

"During the period when Bennett was living in the Bihn household, Mrs. Bihn on many occasions would bring home gasoline ration coupons. When Mrs. Bihn's husband was not present, Mrs. Bihn would give these coupons to Bennett. Bennett would take these coupons, sell them, return home and divide the money received from the sale of these coupons with Mrs. Bihn. Sometimes Mrs. Bihn would bring home loose gasoline ration stamps and sometimes she would bring home gasoline ration stamps already affixed to gummed O. P. A. forms called O.P.A. Forms R 120 (known

in the gasoline trade as 'bingo' sheets). Mrs. Bihn brought these stamps home to Bennett on approximately ten occasions. The average amount of coupons which she brought home was between 300 and 500 gallons each time. The largest amount of coupons that Mrs. Bihn ever brought to Bennett was between 500 and 600 gallons. When these coupons were affixed to 'bingo' sheets, Mrs. Bihn would soak these coupons in water and give then to Bennett to sell after they had been removed from the gummed 'bingo' sheets on which they had been affixed * * * Bennett stated to several of the Government witnesses that all the coupons he received he got from Mrs. Bihn."

As Bennett's statements were not in evidence as to appellant, these portions of the stipulation should, I think, be wholly disregarded.

(b) The transcript of the evidence shows that Bennett's wife, mother-in-law and sister-in-law were jealous of appellant because of her relations with Bennett before his marriage. Yet it was solely from their testimony that the following portion of the stipulation derives:

"Mrs. Howe told Mrs. Bihn that 'if she didn't leave us alone, I would be forced to notify the F.B.I., that I thought they would be very interested in the gasoline coupons and others she was stealing from the bank.' Mrs. Bihn replied: 'Go ahead. Your son-in-law is in it just as deep as I am and if I go to prison he will go too.' "

The transcript shows that appellant, who took the witness-stand and denied that she had stolen any coupons, gave a different version of these remarks: She testified that, on that occasion, Bennett's sister-in-law and mother-in-law had accused her of having written certain letters to Bennett; that she had then denied having done so; and that the mother-in-law had then said to her "I think the F.B.I. will be interested to know about you," but made no mention of gasoline coupons. Appellant admitted that later she wrote a letter to Bennett saying, "I didn't miss that crack about the F.B.I. * * * It looks to me you are trying to break into prison with your bare hands * * * It will hurt you more than me." She testified concerning this letter as follows:

"Q. What did you mean by, 'It looks to me you are trying to break into prison with your bare hands'? A. Because he showed me a postcard his wife received and asked me if I wrote it, and I asked him if he wrote it. He told me once about having written a postal-card to another girl to get rid of her, and it looked like the same method to me.

"Q. What did you mean by saying, 'It will hurt you more than me'? A. Because they talked, the sister-in-law and the mother-in-law, about the letters that they were going to the F.B.I. with."

(c) The transcript also shows the following: As, from time to time, the coupons were deposited in the box, appellant made entries of the deposits. Subsequently, without again examining the contents of the box, appellant, from her previous entries, compiled the written statement which, it turned out, gravely overstated the amount of gasoline represented by the coupons in the box. But, in the interval between the time when she made her first entries and the time when she prepared the inaccurate statement, not less than four persons other than appellant had had access to the box; among them was a Miss Shannon with whom (so appellant testified) Bennett had a far more than casual acquaintance.

2. Thus, disregarding (as we should) that part of the stipulation based upon Bennett's statements, there is no direct evidence of theft by appellant except the testimony of Bennett's wife, mother-in-law and sister-in-law, which might easily have been biased. The only other evidence of her guilt consists of an inference which could reasonably—but need not—be drawn from the gross inaccuracy of the written statement made by appellant of the contents of the box. Accordingly the verdict may well have turned on whether such an inference was made by the jury.

In these circumstances—and remembering that the indictment charged, as an essential part of the conspiracy, that appellant had stolen the coupons—it was of course entirely legitimate for appellant to argue thus to the jury: Since any one of four other persons might have stolen the coupons, there could easily be a reasonable doubt as to appellant's guilt. That issue was obviously crucial.

It was in this context that the judge, in the middle of his instructions, told the jury: "Who would have a motive to steal them? Did she take these stamps? You have a right to consider that. She is not charged

with stealing, but with conspiracy to do all these things, and you have a right to consider whether she did steal them, on the question of intent. Did she steal them? Who did if she didn't? You are to decide that."

Considering what I have called the "crucial issue," it is highly likely that the jurors did not take this remark lightly. They had before them uncontradicted evidence by which, as they knew, appellant was trying to persuade them that, since the coupons might have come into Bennett's possession via any one of four other persons, there was a reasonable doubt as to appellant's guilt. Literally interpreted, the judge's charge told them that this was not sufficient to justify acquittal, for it was their "duty" (a) to decide that appellant committed the theft unless (b) they decided that some other specific person did. So interpreted, this charge erred by putting on appellant the burden of proving her innocence by proving the identity of some other person as the thief. See, e.g., Boatright v. United States, 8 Cir., 105 F.2d 737, 740; Ward v. United States, 5 Cir., 96 F.2d 189, 192 cf. United States v. Wishnatzki, 2 Cir., 77 F.2d 357, 360. The charge would perhaps not have been so interpreted by one with a well trained legal mind; but the Supreme Court has admonished us that the minds of jurors, not being so trained, are usually incapable of making subtle discriminations. Shepard v. United States, 290 U. S. 96, 104, 54 S.Ct. 22, 78 L.Ed. 196. As we have no basis for assuming that the jurors did not accept this charge at its face value, I think we should conclude that it was prejudically erroneous.

True, the judge also gave the usual general instructions about the burden of proof and presumption of innocence. But, in the face of this specific instruction, the best that can be said is that the jurors may easily have been confused. It has often been held that a verdict should be reversed where, when general instructions are inconsistent with a specific instruction, the jury may have been confused. See, e.g., Drossos v. United States, 8 Cir., 2 F.2d 538, 539; Cummings v. Pennsylvania R. Co., 2 Cir., 45 F.2d 152; Schroble v. Lehigh Valley R. Co., 2 Cir., 62 F.2d 993, 996; cf. Shepard v. United States, supra.

When the judge had concluded his instructions, appellant's lawyer excepted as follows: "I take exception to your Honor's charge to the jury that it is the jury's duty to find out who did steal the stamps. 'Did she? Who did if she did not? You are to decide that.' I except to that because it is not part of the jury's duty."

That was a clear enough statement of the nature of the judge's error; surely clear enough for one whom my colleagues characterize as an "experienced trial judge." It advised him that it was erroneous to tell the jury that, as part of its duty, in order to acquit, it must decide what person stole the coupons if appellant did not. The judge, thus warned, did nothing to correct the error, saying merely, "Yes, I say that was not the crime, but the question is whether these defendants entered into a conspiracy to steal, possess, and transfer these stamps." If that meant anything it meant that appellant was not charged with the substantive crime of theft but with theft as part of a conspiracy, a question not raised by the exception. This comment did not correct the erroneous instruction that unless, from the evidence, the jury found that some other identified person stole the coupons, it must conclude that appellant did.

After the trial judge thus commented, appellant's lawyer said, "That is not the point of my exception." My colleagues suggest that that rejoinder was insufficient, that the lawyer should have made his exception more explicit. I do not agree because, as stated above, I think that the reasons originally given for the exception were adequately clear.

3. It is obvious, from my colleagues' discussion of the evidence, that they believe appellant was guilty. Accordingly, this seems to be another instance in which they are tacitly applying their unique interpretation of the "harmless error" doctrine. Their position, as explicitly stated in United States v. Liss, 2 Cir., 137 F.2d 995, 999, is that there is a *"modern disposition to assume that an error has been harmless * * *."* [1] As I have several times heretofore noted in detail, I think that a mistaken assumption.[2]

In McCandless v. United States, 298 U.S. 342, 347, 56 S.Ct. 764, 766, 80 L.Ed. 1205,

---

[1] Emphasis added.

[2] See, e.g., United States v. Rubenstein, 2 Cir., 151 F.2d 174; United States v.

Liss, 2 Cir., 137 F.2d 995, 1001, 1005; Keller v. Brooklyn Bus Corp., 2 Cir., 128 F.2d 510, 513, 514-515.

the Court said that the "harmless error" statute (28 U.S.C.A. § 391) "does not change the well settled rule that an erroneous ruling which relates to the substantial rights of a party is a ground for reversal unless it *affirmatively*[3] appears from the whole record that it was not prejudicial." In Bruno v. United States, 308 U.S. 287, 293-294, 60 S.Ct. 198, 200, 84 L.Ed. 257, the Supreme Court (reversing this court) said that this statute was intended "to prevent matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict." In Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 551, 156 A.L.R. 496, the Court, citing the Bruno case, said: "We are not authorized to look at the printed record, resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty. That would be to substitute our judgment for that of the jury and, under our system of justice, juries alone have been entrusted with that responsibility."[4] All Circuits other than ours in which the question has been considered have acted in accordance with these Supreme Court rulings.[5]

Although usually I concur in the established precedents of this court even when I think them erroneous, I deem it not improper to continue to dissent in cases of this kind until the Supreme Court tells me that I am wrong.

---

[3] Emphasis as in the original.

[4] It is suggested that in Palmer v. Hoffman, 318 U.S. 109, 116, 63 S.Ct. 477, 482, 87 L.Ed. 645, 144 A.L.R. 719, the Court rejected the ruling in Bruno v. United States, supra. But in Palmer v. Hoffman the Court merely held that appellant could not complain on appeal of an error in refusing to allow him to inspect a document in the possession of his adversary when, because appellant had not identified and incorporated the document in the record, the upper court could not possibly ascertain whether its contents were material and therefore could not determine whether the error was harmful; in that limited context the Court said that a party seeking reversal for error has "the burden of showing that prejudice resulted." That, in that limited ruling, the Supreme Court did not intend to repudiate its ruling in Bruno v. United States is made clear, I think, by the fact that subsequently, in Weiler v. United States, 323 U.S. 606, 611, 65 S. Ct. 548, 551, 89 L.Ed. ——, the Court cited the Bruno case with approval.

I think Palmer v. Hoffman merely followed the usual rule that an appellate court cannot ordinarily consider matters not in the record before it. See, e. g., Henneford v. Northern Pacific Railway Co., 303 U.S. 17, 19, 58 S.Ct. 415, 82 L.Ed. 619; Drake v. General Finance Corporation, 5 Cir., 119 F.2d 588, 589; 4 C.J. S., Appeal and Error, § 1203.

[5] Lynch v. Oregon Lumber Co., 9 Cir., 108 F.2d 283, 285-286; Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409, 412; Fort Dodge Hotel Co. v. Bartelt, 8 Cir., 119 F.2d 253, 259; Worcester v. Pure Torpedo Co., 7 Cir., 127 F.2d 945, 947; Evansville Container Corp. v. McDonald, 6 Cir., 132 F.2d 80, 85; cf. Little v. United States, 10 Cir., 73 F.2d 861, 866; Ah Fook Chang v. United States, 9 Cir., 91 F.2d 805, 810; cf. Coulston v. United States, 10 Cir., 51 F.2d 178, 182, 183.