**UNITED STATES v. FARINA et al.**

No. 245, Docket 21694.

United States Court of Appeals
Second Circuit.

Argued June 7, 1950.

Decided July 17, 1950.

Writ of Certiorari Denied Nov. 6, 1950.
See 71 S.Ct. 121.

Rudolph Stand, New York City, for defendant-appellant Joseph Farina.

George J. Todaro, New York City, for defendant-appellant Peter DiPalermo; Vine H. Smith, Brooklyn, N. Y., of counsel.

Harry G. Anderson, New York City, for defendant-appellant Daniel Sperdutto.

Irving H. Saypol, United States Attorney, New York City, for United States of America, plaintiff-appellee; Bruno Schachner and John D. Kelly, Assistant United States Attorney, New York City, of counsel.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. The defendants Farina and DiPalermo were convicted under all three counts of the indictment mentioned above. The defendant Sperdutto was acquitted under the first count, charging him with possession of counterfeit currency, but convicted under the second and third counts. Farina does not question the sufficiency of the evidence to support the verdict against him. DiPalermo and Sperdutto each made weak contentions that the evidence was insufficient to convict. It is however perfectly plain that there was direct proof against DiPalermo and that his argument as to the insufficiency goes merely to the weight of the evidence and that such questions were for the jury. In the case of Sperdutto there was evidence that he acted as a lookout for the other two defendants at the time the counterfeit money was sold and that immediately afterwards he got into a car which he had furnished, started to drive away with Farina, who had entered the same car, and, on seeing the federal agents, jumped out of the car and attempted to escape. He denied that he knew who owned the car, though there was proof that it was originally registered in his name. Later he admitted that it belonged to his girl friend who allowed him to use it. The woman to whose name the car had been transferred from that of Sperdutto said she did not have a driver's license and could not drive, but claimed that she had paid him $750 cash for the car and had allowed him the use of it on the occasion in question. The jury might well have believed that Sperdutto's attempt to disclaim any relation to the car in which he and Farina were driving away involved numerous falsehoods and only added greater weight to the inference of guilt which they might draw from his flight. The claim of DiPalermo and Sperdutto that there was not evidence against them sufficient to go to a jury is clearly without substance.

The only grounds for reversal worthy of serious consideration are the contentions of all the defendants that the trial judge erred in his charge because of his statements about the "presumption of innocence" and his definition of "reasonable doubt." The entire instruction to the jury as to presumption of innocence, reasonable doubt, and burden of proof was as follows:

"Under our law, all persons charged with the commission of crime are presumed to be innocent until their guilt has been established by competent evidence beyond a reasonable doubt. When a person is charged with the commission of a crime, he is not bound to prove that he did not commit that crime, but the Government must prove beyond a reasonable doubt that he did commit it.

"Every defendant is entitled to rest upon the presumption of innocence in his favor.

"The burden of establishing the guilt of each of these defendants beyond a reasonable doubt rests upon the Government, and this burden never shifts.

"This presumption of law inures to the benefit of all defendants charged with crime. It was designed for the protection of the innocent. It was not intended as a bulwark behind which the guilty might hide. If, however, the Government produces evidence which rebuts the presumption of innocence, and, if the evidence convinces you of the guilt of a defendant, beyond a reasonable doubt, then the presumption of innocence ceases to exist as to that particular defendant.

"A reasonable doubt is a doubt based upon reason. It is a doubt for which a juror who says that he has such a doubt about a defendant's guilt, can give a reason for entertaining.

"A reasonable doubt is not a mere guess or surmise that a defendant may not be guilty. It is not a doubt based upon a whim, caprice, prejudice or sympathy or the reluctance of a juror to perform his duty. It is a doubt that must arise from the evidence or the lack of evidence in the case.

"If you are satisfied, in view of the law as I have given it to you, that any of the defendants are guilty of any one or more of the crimes charged, you may say that as to that particular defendant or defendants and as to that particular crime, you have been convinced beyond a reasonable doubt. If you waver or are uncertain of the guilt of any of these defendants as to any particular crime charged against them you have not been convinced beyond a reasonable doubt and you must render, as to that par-ticular defendant or defendants, and as to that charge a verdict of not guilty.

"The Government is not required to prove the guilt of a defendant beyond all possible doubt, or to a mathematical certainty, because such measure of proof is ofttimes impossible in human affairs."

In criticizing the judge's charge regarding the "presumption of innocence," the defendants have particularly objected to the words that: "It was designed for the protection of the innocent. It was not intended as a bulwark behind which the guilty might hide." In his definition of reasonable doubt, they specially criticized the statement that: "A reasonable doubt is a doubt for which a juror who says that he has such a doubt about a defendant's guilt, can give a reason for entertaining."

No objection was taken to any part of the charge, and we are satisfied that nothing said in the course of it calls for a reversal.

The statement that the presumption of innocence was not intended as a bulwark behind which the guilty might hide was in a general sense true. Objection to it will only lie if it might lead a jury to suppose the presumption could not be invoked until a defendant had dispelled proof of his guilt. But such was not the effect of the charge, for the judge had told the jury that a defendant was not bound to prove that he did not commit the crime, but that "the Government must prove beyond a reasonable doubt that he did commit it," and that "the burden of establishing the guilt of each * * * beyond a reasonable doubt rests upon the Government, and this burden never shifts." A decision of the Fifth Circuit as to the proper meaning of the presumption of innocence was recently rendered in Gomila v. United States, 146 F.2d 372, and is strongly relied on by the appellants. The instructions there might perhaps have led a jury to suppose that a defendant could only invoke the presumption after he had established his innocence. Moreover, the Fifth Circuit reversed a conviction, not on the single point that we have mentioned, but because of what was termed a "cumulation of errors" on the part of the trial court. In the case at bar the judge

expressly stated that the presumption "inures to all defendants charged with the commission of crime" and added if "the Government produces evidence which rebuts the presumption of innocence, and if the evidence convinces you of the guilt of a defendant, beyond a reasonable doubt, then the presumption of innocence ceases to exist as to that particular defendant." These instructions were so clear and explicit, that any generalization indulged in by the judge to the effect that the presumption was not intended as a bulwark behind which the guilty might hide could not, in our opinion, mislead the jury regarding the duty of the Government to go forward with convincing proof before a verdict of guilty could properly be rendered.

█ The criticism of the judge's statement that reasonable doubt is a doubt for which a juror "can give a reason for entertaining" is one which has long produced some divergence of opinion in the courts. If the judge had said that a reasonable doubt is one which a reasonable man might entertain, the instruction might not have been illuminating but would hardly have been objectionable to anyone. The appellants argue that the charge given might lead some juryman to suppose that he would be called upon to give his reason. This objection seems fanciful and has already been rejected by this court. Marshall v. United States, 2 Cir., 197 F. 511, 512. The appellants also say that the charge leaves too little room for doubts which cannot be formulated by jurors, but which a reasonable man still might entertain. This contention was rejected as a ground for reversal in our decision in United States v. Woods, 2 Cir., 66 F.2d 262. The only federal decisions dealing with such a charge on reasonable doubt as we have discussed which reached conclusions contrary to our own are those of the Eighth Circuit in Pettine v. Territory of New Mexico, 201 F. 489, and Ayer v. Territory of New Mexico, 201 F. 497, and of the Ninth Circuit in Owens v. United States, 130 F. 279. The Ninth Circuit decision, however, was after-

wards distinguished in Griggs v. United States, 158 F. 572, and overruled by that court in Louie Ding v. United States, 9 Cir., 246 F. 80. See also Young v. Territory of Hawaii, 9 Cir., 160 F.2d 289. Perhaps it was unwise to vary the customary formulae employed in charging juries upon the presumption of innocence and reasonable doubt. But it would seem most unreasonable to upset convictions where as here the substantive proof against the defendants was ample, where for lack of a timely objection no opportunity was given to the judge to reformulate his charge, and where the charge as a whole as well as the conduct of the trial was eminently fair.

█ The defendant Sperdutto contends that he could not properly have been found guilty of selling counterfeit money under the second count, or of conspiracy to possess and sell under the third count, since he had been acquitted of possessing it under the first count. There was no proof that he ever had physical possession of the counterfeit money and the jury evidently thought that because of this he should not be convicted under the first count. On the other hand, his close connection with the other defendants, his action as lookout and his furnishing of the automobile, and his flight were sufficient indications that he had an interest in the disposition of the counterfeit money and was an active factor both in the conspiracy and in the sale.

The judgments of conviction are accordingly affirmed.

FRANK, Circuit Judge (dissenting).

What influences juries, courts seldom know. Indeed, most courts (including the federal courts) not only do not diligently seek such knowledge but have a general policy of deliberate unwillingness to learn —and usually seal up the only possible sources from which they could learn—what occurred in the jury-room. As we recently said, per Judge Learned Hand, this policy stems from awareness that, were the full truth disclosed, it is doubtful whether more than 1% of verdicts could stand.[1]

1. Jorgensen v. York Ice & Machinery Corp., 2 Cir., 160 F.2d 432, 435: "The whole subject has been obscured, apparently beyond hope of clarification, by

22

This self-imposed judicial ignorance [1a]— preventing the courts from knowing how a particular jury behaved and from attaining moderately well-educated guesses as to how juries in general probably conduct themselves—has had some strange corollaries: (1) In spite of—or perhaps because of—this ignorance, upper courts make this remarkable assumption: A very substantial mistake by the trial judge in the wording of a highly intricate substantive rule is assumed to have affected the jury and therefore (necessarily and logically) to have led to a wrong verdict—even when the difference between the correct and the mistaken wording of the rule is one that only a lawyer, after careful study, can detect, so that very probably the mistake could not actually have had any effect on the jury.[2] In such a case, thanks to the unverified and usually unreal assumption, the upper court notes the error—although it was not called to the trial judge's notice—and orders a new trial.[3] (2) Yet, paradoxically, many an upper court will refuse to reverse for a mistake in the charge, unrelated to any intricate substantive rule largely unintelligible to the jury, but dealing with matters far more comprehensible by the jury and therefore far more likely to have influenced their verdict.[4] Such errors, the very kind most to be suspected of working harm, are, I think, too often dismissed as harmless.[5]

My colleagues' opinion in this case illustrates, I think, the second point. For the faulty "presumption of innocence" instruction—that the presumption was "designed for the protection of the innocent" and was "not intended as a bulwark behind which the guilty might hide"—may easily have misled the jury, to the grave prejudice of

Lord Mansfield's often quoted language in Vaise v. Delaval, [1 Term R. 11] that no evidence of misconduct was competent which came from the jurors themselves, although, as judges have repeatedly pointed out, it is impossible to see from what source better evidence could be obtained. On the other hand, it would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test * * *."

See Sunderland, Verdicts, General and Special, 29 Yale L.J. (1920) 253: "The general verdict is as inscrutable and essentially mysterious as the judgment which issued from the ancient oracle at Delphi. * * * The court protects the jury from all investigation as fully as the temple authorities protected the priestess who spake to the suppliant votary at the shrine. * * * Since the case can ordinarily go to the jury only if a verdict either way is legally possible, whatever ,the jury does is presumed to be right, and this presumption excludes any inquiry from the jurors themselves. * * [In] the vast majority of cases the verdict is a complete mystery, throwing a mantle of impenetrable darkness over the operations of the jury. * * * The record must be absolutely flawless, but such a result is possible only by concealing, not by excluding, mistakes."

See also Frank, Courts On Trial (1949) 115–116; cf. Johnson v. Hunter, 10 Cir., 144 F.2d 565, 567.

[1a.] I refer, of course, to the rule that, especially after a jury's discharge, the testimony of no jurors will be received as to what went on in the jury room, except as to the grossest sort of misconduct. See, e. g., Jorgenson v. York Ice Machinery Corp., 2 Cir., 160 F.2d 432.

[2.] As Judge Rossman observed, lawyers engaged in a jury trial frequently say they are not sure of the meaning of a substantive-rule instruction, until it has been written up, after the jury has been discharged. See Rossman, The Judge-Jury Relationship in the State Courts, 3 F.R.D. 98, 109. Cf. Chamberlayne, Evidence (1911) § 96.

[3.] See, e. g., United States v. Ausmeier, 2 Cir., 152 F.2d 349, 357; United States v. Haug, 2 Cir., 150 F.2d 911, 914–915.

[4.] See Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54, note 25d.

[5.] I do not mean that the upper courts are wrong in reversing for the first kind of error. The theory of the general verdict requires them to assume that the jury (a) does understand the intricacies of the substantive rules set forth in the charge and (b) does apply those rules. For a criticism of general verdicts, in this and other respects, see Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54.

the accused. We do not know whether or not it did. But we do know that that "presumption" is much discussed popularly, out of court. Consequently, there prevails a belief, probably well-founded, that jurors listen attentively to, and take with peculiar seriousness, the particular part of the judge's instructions defining that "presumption." On that account, I think the Fifth Circuit, in Gomila v. United States, 146 F.2d 372, wisely held such an instruction, as that here given, reversible error, although there, as here, the defendant had not objected when the charge was delivered.[6]

My colleagues, however, differentiate the charge in the Gomila case because it contained a "cumulation of errors."[7] But so, too, here.[8] The trial judge, far from curing his "presumption of innocence" error by his comments on "reasonable doubt," aggravated that error when he told the jury that such a doubt is one which a juror "can give a reason for entertaining." This again was matter to which the jurors probably paid close attention, since the important "reasonable doubt" principle is also often popularly discussed out of court. The judge's definition of that principle, therefore, most probably impressed the jury.

Now this very sort of instruction was severely criticized, and made the basis of reversals, by Judge Walter H. Sanborn of the Eighth Circuit.[9] He, one of our greatest judges,[10] was no soft "sentimentalist," eager to absolve criminals, but he was sensitive to the possible tragic impact on men's civil liberties of verdicts due to carelessly phrased statements by trial judges to juries. As he pointed out, the instruction he condemned means that the jurors must not consider any doubt about guilt unless they can articulate, at least to themselves, a sound "reason" for doing so.

Our own judicial experience teaches that sometimes even trial judges have difficulty in rationally explaining the grounds of their decisions. Some trial judges resent any obligation in jury-less cases, where the oral testimony is conflicting, to go beyond publishing laconic, unexplained, judgments. They even object to filing special findings of fact. Some of those judges complain that the formulation of fact-findings is too arduous and, more, bound to be artificial.[11] I share the view that, on net-balance, that complaint is unjustified.[12] There would be more justification for complaint, if a trial judge were required to reveal, or even to disclose that he himself knew, the "reasons" for his special findings. But there is no such requirement.

Surely, then, we ought not ask a juror, who has nothing like a trial judge's experience and training, not merely to find facts[13] but also to be able to recognize, and to make explicit to himself or the

6. We cited the Gomila case in United States v. Modern Reed & Rattan Co., 2 Cir., 159 F.2d 656, 658, where we held that a plain error should be noted on appeal although no objection had been made in the trial court.

7. The "presumption of innocence" error, however, was the first error discussed in the Gomila opinion.

8. Were it necessary, I would hold that the "presumption of innocence" error alone warranted reversal.

9. See Pettine v. Territory of New Mexico, 8 Cir., 201 F. 489; Ayer v. Territory of New Mexico, 8 Cir., 201 F. 497.

10. Of course, no invidious distinction of the present very able Judge John B. Sanborn is intended.

11. "We all know, don't we," asked Judge McLellan, "that when we hear a criminal case tried, we get convinced of the guilt of the defendant or we don't; and isn't it enough if we say guilty or not guilty, without going through the form of making special findings of fact designed by the judge—unconsciously, of course—to support the conclusions at which he has arrived?" Federal Rules of Criminal Procedure, With Notes and Proceedings of the Institute of Law of the New York University School of Law (1946) 173. See also Davis, Administrative Findings, Reasons and Stare Decisis, 38 Calif.L.Rev. (1950) 218, 221, 227.

12. See Frank, Courts On Trial (1949) 183–185; Davis, 38 Calif.L.Rev. (1950) 218, 226.

13. As to the desirability of special verdicts (i. e., fact-verdicts), see, e. g., Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54.

other jurors, the "reason" for joining in a finding of fact or for any intermediate step in his mental processes. Mr. Justice Holmes, speaking for the Supreme Court, said the reasoning of an administrative body need not be thus articulate, since its decision expresses "an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions * * * which may lie beneath consciousness without losing their worth." [14] We should not exact more of a jury. Accordingly, I think the jurors were badly misinstructed when told they must ignore any doubt which they could "give no reason for entertaining."

My colleagues assume, in effect, that the jurors construed that instruction as would an intelligent law student or lawyer, wellversed in the traditional meaning of "reasonable doubt." I cannot go along with that assumption. Far more probably, the jurors thought the judge meant just what he said. One can, then, well imagine that one of the jurors, when in the jury-room, impressively remarked to his fellow-jurors: "Remember that the judge especially warned us we must discard any doubt about guilt unless we can 'give a reason' for holding it." So it seems to me not at all improbable that the jurors, acting under this erroneous instruction, and incapable of formulating a rational explanation of a doubt they entertained, concluded that they had the duty to discard a doubt which, had they been properly instructed, would legitimately have yielded an acquittal. The defendants ought not bear the risk that the verdict derived from such an error.

I should add that the decisions cited by my colleagues, of this court [15] and of the Ninth Circuit,[16] which (in whole or in part) disagreed with Judge Sanborn's ruling,

were written when, previous to Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, those courts were misinterpreting the "harmless error" doctrine. The evidence in the present case does not suffice to render the errors "harmless" within the ruling of the Kotteakos case. For it cannot be said, from merely reading the printed record, that the defendants are so unmistakably guilty that the jury would have been unreasonable if, guided by proper instructions, it had found them innocent.[17]

---

14. Chicago, B. & Q. Ry. Co. v. Babcock, 204 U.S. 585, 598, 27 S.Ct. 326, 329, 51 L.Ed. 636.

15. United States v. Woods, 2 Cir., 66 F.2d 262. There the acquiescence in the instruction was somewhat grudging and half-hearted.

16. Louie Ding v. United States, 9 Cir., 246 F. 80.

17. Of course, that is not the same as saying—and I certainly do not say—that there was such insufficient evidence of guilt that a jury, even if properly instructed, would have been unreasonable, had it found them guilty. For elaboration of this distinction, see my dissenting opinion in United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, 642, 650–652. The decision there antedated the Kotteakos decision.