## UNITED STATES v. WALKER.

### No. 242, Docket 21978.

United States Court of Appeals
Second Circuit.

Argued April 9, 1951.

Decided July 10, 1951.

Frank, Circuit Judge, dissented.

Irving H. Saypol, U. S. Atty., New York City, for Southern District of New York (Bruno Schachner, Harold J. Raby and Robert Rubinger, Asst. U. S. Attys., all of New York City, of counsel), for appellee.

Sabbatino & Todarelli, New York City (Peter L. F. Sabbatino, New York City, of counsel), for appellant.

Before SWAN, CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

Following the reversal by this court of his former conviction, the appellant was again tried by jury upon the same indictment and was found guilty and sentenced.

The indictment charged in one count that, on or about February 17, 1947, he transported the sum of approximately $26,000.00 in interstate commerce from Houston, Texas, to New York, N. Y., knowingly and willfully in violation of the provisions of § 415 of Title 18 U.S.C.[1] The second count was like the first except that the sum of money was alleged to be approximately $23,500.00 and the transportation on or about June 1, 1947.

The facts as stated in our former opinion [2] are so close to what was shown in this trial that we shall assume familiarity with them and take up at once the grounds upon which the appellant relies for reversal, adding only such facts as may be necessary to a disposition of the new points now made and following our former decision as to those which were raised before.

There no question was raised as to the sufficiency of the indictment and it was treated *sub silentio* as good. Now it is argued that each count was fatally defective because instead of alleging that "money" of a stated value was transported it refers to the "sum" of a stated amount of dollars. It would be hard to think of a more insubstantial objection to the indictment and it should not detain us long.

---

1. 1948 Revised Criminal Code, 18 U.S.C.A. § 2314.

2. 2 Cir., 176 F.2d 564.

Surely since Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., became effective such a finely spun attack on an indictment is fruitless. There was a clear compliance with that rule and no more was necessary. United States v. Josephson, 2 Cir., 165 F.2d 82, certiorari denied 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122. Moreover, a bill of particulars was filed by the government which removes any possibility of prejudice to the defendant.

It is argued that when Mrs. Ashe delivered the two checks to the defendant she intended to pass the title to him, and that it was error for the court to deny a request to charge the jury that if it was found that she so intended he was not guilty as charged in the indictment. This, however, leaves entirely out of account the element of deceit by which, according to substantial evidence, he induced her to obtain the checks and deliver them to him. The statute covers the transportation of money obtained by fraud regardless of title, see Davilman v. United States, 6 Cir., 180 F.2d 284, and the failure to charge as requested was not erroneous.

Before the trial, the appellant moved to suppress evidence which had been obtained by a government agent in a search of his luggage after his arrest and while he was in jail. The luggage had been seized and some of it searched, in the hotel room occupied by Mrs. Ashe, who then thought she was the appellant's wife, and both the agent's entry into the hotel room and the seizure and search of the luggage were consented to by her. The motion to suppress the evidence thus obtained was rightly denied, for the appellant had no right to object to the search of premises not occupied by him nor to the seizure of property not within his possession. United States v. Reiburn, 2 Cir., 127 F.2d 525; United States v. Ebeling, 2 Cir., 146 F.2d 254. Cf. Stein v. United States, 9 Cir., 166 F.2d 851, certiorari denied 334 U.S. 844, 68 S.Ct. 1512, 92 L.Ed. 1768. In connection with the motion to suppress, appellant's counsel moved for the production of the F. B. I. report of the investigation, for examination by the court, "to test the credibility" of the agent. Mrs. Ashe, as well as the agent, had testified to the circumstances of the search, and we are unable to conclude that the denial of this motion was seriously prejudicial to the appellant because of the possibility that something in the report might have been inconsistent with the agent's testimony at the hearing.

The appellant's counsel in summation pointed out that government agents had testified in this trial to certain admissions of the appellant which they had not mentioned in the earlier trial. By way of explanation, one agent had stated that the prosecutor in the earlier trial had told him not to mention these admissions. Presumably further to persuade the jury to infer that it was untrue that the admissions had been so made and suppressed, or perhaps to charge the prosecutor with misconduct, the appellant's counsel sought also to point out that the prosecutor in the present case had been present and had assisted at the former trial, but an objection was sustained to that observation. Appellant's counsel insisted that the record showed that fact, and requested leave to point it out and to read from the record, but the judge, evidently believing that he meant the record of the former trial, denied the request saying, "No, the record was not introduced in this trial." The attorney then said he meant the record in this trial but the denial stood, and the judge told him, "conclude your summation and do not argue with me." Apparently this episode shows nothing more than judicial impatience, which we are not prepared to say was unjustified under the circumstances, but, however that may be, it was no more than an exercise of the discretion to limit summation on a point which the judge justifiably believed had already been made repetitiously.

During the summation of the district attorney no objection was made to his remarks but at the end counsel for the appellant moved for a mistrial because of the "prejudicial nature" of the summation, and pointed out specific terms which had been used to characterize the appellant. He also included the fact that the government attorney had told the jurors that he believed "on the evidence in this case that the guilt

of this man has been proved incontestably" and that if they should acquit him "they were not competent to serve as jurors." The motion was denied. No reference was made to the summation in the charge and there was no request to do so nor exception because of any such failure on the part of the court.

 In a sort of peroration the assistant district attorney had undertaken to refute some of the argument made by the appellant's attorney by pointing out how despicable the evidence did show the appellant's misconduct to have been. The evidence was ample to show that, while he was playing the part of a wealthy suitor so enamored of Mrs. Ashe that he wanted her to marry him, the appellant had gone to Ohio and had there gone through the marriage ceremony with another woman from whom he had been fraudulently obtaining sizeable amounts of money during the current months. He then quickly deserted her to go back to Mrs. Ashe, to go through the pretense of a marriage to her within the following month. This pretended marriage was a part of the fraud practiced upon her to obtain the money he was charged with having transported in interstate commerce. Such a portrayal in the evidence of such a person did lend itself to caustic comment, and some of the terms used in referring to the appellant were " * * * these telegrams over which no one but the defendant had any control, on their face show him to be what he is, a crook and a phony, that is as plain and sure as two and two make four, tricky, crafty, and a type of worm." Although the prosecutor could, doubtless, have chosen his language with better taste and by so doing the better have advanced his cause, we are not disposed to reverse because, instead, he chose to sting sensibilities with blunter, shorter, and somewhat unsophisticated words.

At another point he referred to "silent witnesses" whom appellant's counsel had previously mentioned, meaning those who had not testified, and among them the district attorney included a son of the appellant. The language was as follows:

"The silent witnesses Mr. Sabbatino talks about, the new type of witness, I have never heard of them before and I think the Judge will instruct you unless I am wrong, that they are not witnesses at all. We don't know the fact and you have no right to conclude as there is no evidence on the point.

"We don't know whether this natural son of an unnatural father despised this man or loved him. Now let us draw no conclusions about it."

The argument is made that in referring to the appellant and his son as "this natural son of an unnatural father" the prosecutor was especially abusive, without warrant in the evidence, because it was an accusation that the appellant was the father of a son born out of wedlock. It is true that is one of the meanings of the expression "natural son," see Funk & Wagnalls New Standard Dictionary, and it may be taken to have that connotation in legal parlance. Marshall v. Wabash R. Co., C.C.Ohio, 46 F. 269, 273. But it may also mean a begotten child in contrast to an adopted one, and "natural" may mean "human," or normal, as opposed to "unnatural" meaning "abnormally cruel or wicked." Webster's New International Dictionary, 2 Ed. Thus, instead of an unfounded slur which more or less subtly accused the appellant of being the father of an illegitimate son, the language used may well have expressed the thought that the jury should ignore the son as a "silent witness" for the appellant because it was unknown whether the appellant's own normal son did love or dispise his wicked father. At least the language now attacked was so ambiguous that if counsel for the appellant felt that the jury would believe the prosecutor meant what it is now argued an objection should have been made to permit a clarification then and there. Without that, we will accept the equally plausible interpretation which was within the scope of fair comment on the record as made at the trial. The prosecutor's direct assertion of his belief that the testimony proved this or that which established the appellant's guilt, while improper, was strictly speaking, argument upon irrelevant matter not in evidence, for what the prosecutor believed in that regard was of no consequence. To hold,

however, that in the absence of any timely objection such a readily correctable fault should be raised to the height of reversible error merely would make a mountain out of a mole-hill.

■ Finally it is urged that it was reversible error to refuse to charge a request which emphasized that the government had the burden to prove the appellant's guilt beyond a reasonable doubt, and that the appellant had no burden to sustain and must be acquitted if on all the evidence there was a reasonable doubt of his guilt. The substance of this request was clearly charged and that, without choosing the language, is all to which the appellant was entitled.

Judgment affirmed.

———◆———

FRANK, Circuit Judge (dissenting).

I think the prosecutor far exceeded the bounds of legitimate argument in his summation, and I do not believe that this error was "harmless." In short, I do not believe that the defendant received the fair trial to which he was entitled.

The prosecutor's summation was shot through with prejudicial, abusive, intemperate language, and constituted error in at least three respects.

1. The prosecutor engaged in a bitter name-calling attack on the defendant. Here are some of his more colorful epithets: He dubbed the defendant "a crook and a phony, that is as plain and as sure as two and two make four, tricky, crafty, and a type of worm." "The defendant is a type of worm roaming the earth, and to call him that, a man, he is a creature, God help him, not a man but a creature christened John Donald Walker." "He is the type of bird that preys on society in this slimy field * * *" [i. e., the field of the confidence man]. The defendant was also described as "* * * this depraved creature of twisted mind." This sort of abuse is more than the ardor of aggressive advocacy—it is error. Viereck v. U. S., 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L. Ed. 734; Ross v. U. S., 6 Cir., 180 F.2d 160, 166–168; Beck v. U. S., 8 Cir., 33 F.2d 107, 114; Volkmor v. U. S., 6 Cir., 13 F.2d 594, 595; Fish v. U. S., 1 Cir., 215 F. 544, 552, L.R.A. 1915A, 809; People v. Fielding, 158 N.Y. 542, 53 N.E. 497, 46 L.R.A. 641; People v. Reimann, 266 App.Div. 505, 506–507, 42 N.Y.S.2d 599; People v. Teiper, 186 App.Div. 830, 175 N.Y.S. 197; Commonwealth v. Capalla, 322 Pa. 200, 185 A. 203, 205–206.

Such conduct is in striking contrast with the standard set for the prosecutor by Mr. Justice Sutherland, speaking for a unanimous Supreme Court in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314: "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. * * * He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

Moreover, in the setting of such strong language, I doubt whether one can say with confidence that the jury accorded my colleagues' charitable construction to the prosecutor's description of defendant's son as "this natural son of an unnatural father."

2. The prosecutor told the jury (a) that he believed the defendant guilty, and (b) that he did not believe the testimony of a defense witness:

(a) Of defendant's guilt, the prosecutor said: "If you believe, as I do, on the evidence in this case that the guilt of this man has been proved incontestably; if you believe with me, and you remember back at the start of this trial that the Government's attitude from the first was that the first twelve people in the box were good enough for me, because I don't believe a jury of twelve people, and I will take any twelve, could fail to find this defendant guilty of the crime he is charged with, because the

proof is overwhelming, and if the jury did not so find on this overwhelming evidence in this case, it might well be said by someone that perhaps they were not competent to serve. * * *" It was improper, I think, for the prosecutor to state in this manner his belief in defendant's guilt. Cf. Rossi v. U. S., 8 Cir., 9 F.2d 362, 367; Commonwealth v. Capalla, 322 Pa. 200, 185 A. 203, 206.

(b) Of one defense witness and his testimony, the prosecutor told the jury, "* * * the colored boy was brought up there to try to suggest to you that maybe the defendant is not guilty of the second count * * * as far as I am concerned, the colored boy is telling you a lie, and he is a perjurer. * * *" He "was cute enough to get in the racial discrimination angle, but I ask you to find that he told you nothing of the truth about this case, and I think you will so find." This, too, was improper. Berger v. U. S., 295 U.S. 78, 86–88, 55 S.Ct. 629, 79 L.Ed. 1314; Weathers v. U. S., 5 Cir., 117 F.2d 585, 586–587; People v. Reimann, 266 App.Div. 505, 507, 42 N.Y.S.2d 599.

3. Finally, in the course of his closing, the prosecutor referred to a document not in evidence. The defendant's lawyer had attacked the credibility of Mrs. Ashe, defendant's "wife" and the principal witness for the Government, by pointing out that the account she gave at the trial of her first meeting with defendant conflicted with the version of the same event which she gave in her initial written statement to the F. B. I. In reply, the prosecutor said: "* * * this is all he [defense counsel] had to work with in his summation on its face an ostensible contradiction, but you remember that there is another exhibit here, Court's Exhibit 1, which I showed to Mrs. Ashe, seven pages, a second statement which she gave to the F. B. I. agents." Court's Exhibit 2, Mrs. Ashe's original statement to the F. B. I. was in evidence, but Court's Exhibit 1 was not. The prosecutor's reference to it to rebut

the attack on Mrs. Ashe's credibility was clearly error, U. S. v. Toscano, 2 Cir., 166 F.2d 524, 527; People v. Fielding, 158 N. Y. 542, 547, 53 N.E. 497, 46 L.R.A. 641. Further, it seems more than likely that it had a telling effect on the jury. For after pausing briefly to defend Mrs. Ashe's credibility, the prosecutor went on to say: "* * * if you believe here that she lied, if you don't believe her on this, then you should acquit the defendant." After the charge had been given and the jury had retired for about a half-hour, the jury returned and asked for "the first original statement to the F. B. I. by Mrs. Ashe, also the second one." The judge replied, in part: "You may not receive, nor may you have displayed to you Court's Exhibit 1, because that was not marked in evidence; it was merely marked for identification." Some eighteen hours later,[1] after having been obviously in disagreement at one time, the jury ultimately brought in its verdict of guilty.

I doubt whether the judge's instruction sufficed to cure this last error, for, to the jury, this was clearly not an open-and-shut case, and it had obviously been impressed by the prosecutor's misadversion to a document not in evidence on an issue which he himself had styled as crucial to his case. U. S. v. Toscano, supra.

But I do not rest my dissent on this doubt alone. It must be considered in the setting of the intemperate abuse heaped on the defendant in the closing argument, and together with the prosecutor's vigorously stated affirmation both of his belief in defendant's guilt and of his disbelief in the credibility of a defense witness. Taken together, I think that these errors may well have tipped the scales against the defendant.

Reading merely the testimony as it appears in cold type, the case against him seems "strong" to the reader. But it could not have seemed overly so to the jurors since, as previously noted, at one time they were in disagreement, and it took them

1. Including an overnight stay in a hotel. From the record it appears that the jury spent about eight hours in actual deliberation. Cf. Bollenbach v. U. S., 326 U. S. 607, 611–612, 66 S.Ct. 402, 90 L.Ed. 350.

some nineteen hours in all to agree.[2] That fact must be borne in mind in applying the test of "harmless error" stated in Kotteakos v. U. S., 328 U.S. 750, 764–765, 66 S. Ct. 1239, 1247, 90 L.Ed. 1557: "And the question is, not were they [the jury] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. * * *

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand, * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[3]

With the jury in doubt for many hours, I cannot see how we can say that the errors had no substantial influence. Those errors consisted largely of highly improper colloquial statements by the prosecutor—talk of a kind easily understandable by the jurors, and thus calculated to impress them far more than the formal, legal terms of the judge's charge as to the substantive legal rules.[4] Yet, if the judge had erred in the wording of a substantive legal rule, we would reverse.[5] We ignore the actualities and condone abuse if we hold harmless the plain but viciously prejudicial remarks of the prosecutor.

Because of the grave probability that these errors improperly swayed the jury, I think we should hold that defendant did not receive a fair trial, and should give him a new one.

Nor can I agree that the defendant failed to save objections to these errors. He moved for a mistrial at the close of the summation, laying as his grounds the language I have set forth. Whether or not the trial judge was justified in denying that motion, such highly improper argument called, at the very least, for strong and specific words, in the charge, to cure the errors, even in the absence of a request by defense counsel. Viereck v. U. S., 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L.Ed. 734; Berger v. U. S., 295 U.S. 78, 85, 55 S.Ct. 629, 79 L.Ed. 1314; People v. Fielding, 158 N.Y. 542, 543, 553, 53 N.E. 497, 46 L.R.A. 641. Cf. Quercia v. U. S., 289 U.S. 466, 472, 53 S.Ct. 698, 77 L.Ed. 1321.

In the past I have often disagreed with my colleagues in the application of the "harmless error" doctrine.[6] It is a delicate

---

2. See Note 1, supra.

3. See also Krulewitch v. U. S., 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790; Bihn v. U. S., 328 U.S. 633, 638, 639, 66 S.Ct. 1172, 90 L.Ed. 1485; Bollenbach v. U. S., 326 U.S. 607, 613–615, 66 S.Ct. 402, 90 L.Ed. 350; Weiler v. U. S., 323 U.S. 606, 611, 65 S.Ct. 548, 89 L. Ed. 495; Bruno v. U. S., 308 U.S. 287, 293–294, 60 S.Ct. 198, 84 L.Ed. 257; McCandless v. U. S., 298 U.S. 342, 347–348, 56 S.Ct. 764, 80 L.Ed. 1205; Berger v. U. S., 295 U.S. 78, 82–84, 84–89, 55 S. Ct. 629, 79 L.Ed. 1314; Echert v. U. S., 8 Cir., 188 F.2d 336, 341–342; Sang Soon Sur v. U. S., 9 Cir., 167 F.2d 431, 432–433; Kempe v. U. S., 8 Cir., 151 F.2d 680, 689–690; U. S. v. Dressler, 7 Cir., 112 F.2d 972, 977–981. Compare

the words of Judge Magruder: "If the prosecutor is not content to rely on the untainted evidence, and chooses to 'button up' the case by the known use of perjured testimony, an ensuing conviction cannot stand, and there is no occasion to speculate upon what the jury would have done without the perjured testimony before it." Coggins v. O'Brien, 1 Cir., 188 F.2d 130, 139 (concurring opinion).

4. Cf. People v. Fielding, 158 N.Y. 542, 543, 553, 53 N.E. 497, 46 L.R.A. 641; Commonwealth v. Capalla, 322 Pa. 200, 185 A. 203, 205.

5. See my dissenting opinion in U. S. v. Farina, 2 Cir., 184 F.2d 18.

6. U. S. v. Liss, 2 Cir., 137 F.2d 995, 1001; U. S. v. Mitchell, 2 Cir., 137 F.2d 1006,

task, at best, which requires a careful weighing of more or less, from case to case. I feel justified in venturing to state my differences here once again because from time to time the Supreme Court has struck a balance different from ours and has held errors prejudicial which we had called "harmless."[7] I would reverse this conviction and direct a new trial.

1011–1012; U. S. v. Rubenstein, 2 Cir., 151 F.2d 915, 919; U. S. v. Bennett, 2 Cir., 152 F.2d 342, 346, reversed sub nom. U. S. v. Bihn, 328 U.S. 633, 66 S.Ct. 1172, 90 L.Ed. 1485; U. S. v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, 642; U. S. v. Farina, 2 Cir., 184 F.2d 18, 21.

7. Berger v. U. S., 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Bruno v. U. S., 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257; Bollenbach v. U. S., 326 U.S. 607, 66 S. Ct. 402, 90 L.Ed. 350; Bihn v. U. S., 328 U.S. 633, 66 S.Ct. 1172, 90 L.Ed. 1485; Kotteakos v. U. S., 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Krulewitch v. U. S., 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790.